UNITED STATES of America,

v.

J. David SMITH, Appellant in 98–6377

Steven Dandrea, Appellant in 98–6378

Nos. 98–6377, 98–6378.

United States Court of Appeals,
Third Circuit.

Argued April 28, 1999

Filed Aug. 9, 1999

See also, 82 F.3d 1261, 123 F.3d 140, and 992 F.Supp. 743.

Lawrence S. Lustberg, Esquire (AR-GUED), John J. Gibbons, Esquire, Mark A. Berman, Esquire, Kristine V. Ryan, Esquire, GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, a Professional Corporation, Newark, New Jersey, Attorneys for Appellant J. David Smith.

Kevin H. Marino, Esquire (ARGUED), Richard E. Shapiro, Esquire, Roseann Bassler, Esquire, KEVIN H. MARINO, P.C., Newark, New Jersey, Attorneys for Appellant Steven Dandrea.

Norman J. Gross, Esquire, (ARGUED), Assistant United States Attorney, Mitchell S. Cohen Courthouse, Camden, New Jersey,

Faith S. Hochberg, Esquire, United States Attorney, Newark, New Jersey.

Before: MANSMANN, WEIS, and GIBSON,* Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The defendants were convicted on a number of charges arising out of an embezzlement/kickback scheme. The District Court used the more severe money laundering guideline instead of that for fraud as the basis for sentencing. We will affirm the convictions, but remand for resentenc-

---

* The Honorable John R. Gibson, United States Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

ing based on the pronouncements of the United States Sentencing Commission that the money laundering guideline was drafted to cover conduct more egregious than that involved here.

GTECH Corporation provided lottery services for a number of states including New Jersey. Defendant J. David Smith was GTECH's national sales manager at the relevant time and had recently arranged for permission to do outside consulting of his own.

In the early 1990's, in an effort to secure New Jersey's approval to inaugurate GTECH's new gambling game, "Keno," Smith contacted Benchmark Enterprises, Inc., a consulting company owned and operated by defendant Steven Dandrea and Joseph LaPorta. Although neither of those individuals had lobbying experience, LaPorta was a cousin of the New Jersey Governor's chief of staff.

In exchange for a monthly fee of $30,000 from GTECH, Benchmark agreed to introduce company representatives to state officials. Smith told GTECH officers that Benchmark would accept no less for its services. The amount was approved and apparently in line with similar "government relations" contracts between GTECH and its consultants.

With Benchmark's help, Keno was approved by the New Jersey Lottery Commission in January 1993. The project failed, however, when the Governor took no further action. Benchmark continued to assist GTECH in negotiations to renew its existing lottery contract with New Jersey.

Also in 1993, GTECH sought to secure a lottery contract with the state of Delaware. Smith engaged Sambucca Consultants, Inc., a company formed by Dandrea and LaPorta for this very purpose. Although successful in arranging a meeting with Delaware's Lieutenant Governor, Sambucca did not secure a lottery contract for GTECH. A third company, Production Group, Inc., also owned and operated by Dandrea and LaPorta, received $10,000 monthly, despite performing no actual work for GTECH. After failing to gain a foothold in Delaware, GTECH terminated the consulting services of Sambucca and Production Group.

In the meantime, beginning in June 1992 and continuing through November 1993, Benchmark made a series of payments either to Smith or on his behalf, totaling $169,500. At least 15 of the checks were made payable directly to Smith's creditors.

In the course of an investigation into the conduct of state officials, the federal government uncovered the transactions between Smith and Benchmark, which it viewed as a embezzlement/kickback scheme. Smith, Dandrea and LaPorta were indicted in the United States District Court for the District of New Jersey on one count of conspiracy to defraud GTECH, 18 U.S.C. § 371; three counts of interstate transport of stolen property, 18 U.S.C. § 2314; one count of causing unlawful interstate travel with intent to distribute stolen proceeds, 18 U.S.C. § 1952; and 15 counts of money laundering, 18 U.S.C. § 1956. Smith was indicted on the same day in the United States District Court for the Western District of Kentucky on somewhat similar charges.

The Kentucky case came to trial first and after the government presented its evidence, the trial judge entered a judgment of acquittal in Smith's favor. Following Smith's unsuccessful efforts to invoke a double jeopardy defense, see *United States v. Smith,* 82 F.3d 1261 (3d Cir.1996), the New Jersey case proceeded to trial. Smith and Dandrea were convicted on all counts and LaPorta was acquitted. Post-trial motions were denied. These consolidated appeals followed. Although defendants raise a number of asserted errors on appeal, most do not require extended discussion.[1]

---

1. Dandrea, whose defense strategy was to

prove lack of intent, argues that the trial court

## I.

■ Smith and Dandrea both contend that there was insufficient evidence to sustain their convictions. We exercise plenary review and must determine whether, viewing the evidence most favorably to the prosecution, there is substantial evidence to support the guilty verdicts. *United States v. Idowu*, 157 F.3d 265, 268 (3d Cir.1998). Defendants bear a heavy burden in a sufficiency challenge, *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998), and cannot simply reargue their defense.

■ Here, the prosecution's theory was that the invoices billed to GTECH were purposely inflated to build in the kickbacks ultimately paid to Smith for ensuring Dandrea and Benchmark further company business, and that Benchmark was not paying Smith for consulting services rendered.

At trial, GTECH officers confirmed that they had approved Benchmark's fee and considered it comparable to fees paid to other consultants on retainer. Smith, however, had falsely represented to GTECH officers that he had tried to negotiate a lower fee. It was significant that Dandrea and LaPorta had no lobbying experience, in contrast to another consultant who had received a substantially lower fee for her help in promoting Keno. Trial evidence suggested that Dandrea spent much of his compensated time learning about GTECH's operations, rather than actively promoting them. We are therefore satisfied that the record contains sufficient evidence from which the jury could find that the invoices submitted to GTECH were inflated.

Smith also contended at trial that the payments he received were justified by work he had performed for Benchmark as an independent consultant. One check contained a notation naming a third party whom Smith had allegedly introduced to Benchmark. Other checks, however, were issued and sent directly to Smith's creditors without such notations.

Smith told differing stories to his creditors and lied to his accountant about the source of the payments. Further, there was no written consulting arrangement or similar indicia of employment such as invoices or expense receipts retained in either Smith's or Benchmark's files. The jury could reasonably infer the absence of a legitimate consulting arrangement and thus, we reject Smith's sufficiency challenge.

For his part, Dandrea contends that the prosecution failed to establish that he possessed the requisite *mens rea*—i.e., that he knew the kickback money was procured by fraud. He argues, based on Smith's status with GTECH and GTECH's mode of doing

erroneously excluded evidence as hearsay. We discern no error. *See United States v. Hernandez*, 176 F.3d 719, 726–27 (3d Cir. 1999); *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1274 (3d Cir.1995) ("[s]tatements that are considered under ... the 'state of mind' exception, cannot be offered to prove the truth of the underlying facts asserted.").

Both defendants seek a new trial on the basis that the prosecution, in violation of the rule in *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), knowingly presented false or substantially misleading testimony in connection with the term "pass through." In the Kentucky trial, the government had asserted and witnesses confirmed that GTECH used "pass through" companies. During the trial in this case, however, GTECH

officers who had not appeared in the Kentucky trial testified that "pass through" was not a term or device used by GTECH. The District Court observed that "pass through" was not given the same meaning in both trials. Under the circumstances, we see no error in the District Court's rejection of the defendants' contentions. *See also United States v. Harris*, 498 F.2d 1164 (3d Cir.1974). In addition, defendants point to material that they argue should have been disclosed under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Again, we see no error. *See Strickler v. Greene*, —— U.S. ——, 119 S.Ct. 1936, 1952–55, —— L.Ed.2d —— (1999) (impeachment evidence that would have provided powerful ammunition for the defense was not material under *Brady*).

business, that he was merely following Smith's instructions and thus did not know that the funds were procured by fraud.

At best, Dandrea's challenge is an attempt to draw favorable inferences from evidence that the jury was entitled to discredit. The prosecution asked the jury to infer Dandrea's participation and knowledge of the fraud from his actions in submitting invoices for little or no work, setting up Sambucca and Production Group, Inc. knowing that they would perform little or no services, paying Smith's creditors under suspicious circumstances, and lying to his secretary.

The jurors were entitled to disbelieve Dandrea's theory that he was merely acting at Smith's behest. Although they could have concluded that Dandrea was duped by Smith, they instead inferred that he was an integral part of the scheme. The evidence is not overwhelming, but the inferences drawn by the jury are supported and reasonable. *See United States v. Navarro*, 145 F.3d 580, 593 (3d Cir.1998) (jury may draw any reasonable inferential conclusion which, based on common sense and experience, reasonably flows from the evidence).

All in all, although Smith and Dandrea have provided us with forceful arguments, we cannot say that the jury verdicts lacked sufficient support in the record.

## II.

As part of Smith's amicable severance agreement with the company, GTECH agreed to pay the counsel fees that he incurred in defending against the criminal charges. During pretrial skirmishing, Smith's counsel, Dominic Amorosa, objected to the prosecution's disclosure of the fact that a GTECH officer had invoked his Fifth Amendment privilege in a related proceeding. Amorosa suggested to the trial judge that the prosecution may have been trying to intimidate that officer as a witness. The prosecution responded by questioning whether Amorosa's conduct revealed a conflict of interest in favor of GTECH over Smith.

In fulfillment of the court's duty of inquiry, *see Wood v. Georgia*, 450 U.S. 261, 272, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), the trial judge conducted a hearing with Smith present. The prosecutor voiced his concern that Amorosa might be foregoing access to *Brady* evidence potentially favorable to Smith in order to curry favor with GTECH so as to assure payment of his fee. In response, Amorosa assured the court that, even though GTECH was paying his fees, no conflict existed. He offered Smith for questioning on the matter. The trial judge noted the distinction between GTECH and its officers and said, "I, frankly don't see what the conflict is.... I think it is part of the jousting .... [about] trial tactics." Smith was not asked to testify, nor did he offer any response.

Smith now contends that Amorosa had a conflict of interest that adversely affected his presentation of a defense and that the trial court failed to adequately explore this possibility. Dandrea, because Amorosa acted as lead counsel in questioning GTECH officers at trial, asserts that he too was affected by this alleged conflict. Smith, however, did not object to Amorosa's continued representation. *See Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (defendant who failed to object at trial must demonstrate that an actual conflict of interest adversely affected his counsel's performance). Moreover, he practically concedes that Amorosa provided a zealous defense, *see* Reply Br. at 12, and this, the record clearly verifies. Having carefully reviewed the hearing transcript, we are also satisfied that the trial court fulfilled its duty to inquire into the potential conflict. Under the circumstances, we discern no reversible error as to either defendant.

## III.

Smith and Dandrea assert prejudice arising from another pretrial incident.

Before the prosecution opened to the jury, an attorney for GTECH came to chambers to meet with the judge in the prosecutor's presence. What transpired was not recorded.

Defense counsel were not invited to the meeting. They learned of it immediately afterwards, however, and inquired as to its substance. The judge quickly assured them: "If I thought it were an issue that concerned the defense at all, I would have had you in." Smith's attorney, in the next breath, replied, "Fair enough." Still, the judge continued to assure counsel that no action had been taken as a result of the meeting. Smith's attorney replied, "I'm satisfied."

Dandrea's attorney pressed the point slightly further, asking if the meeting involved either side's opening or "what we are permitted or not permitted to say or do." Here, the judge acknowledged that the prosecution's opening had been mentioned. Finally, after some further discussion, Smith's attorney said, "You're preaching to the converted. I'm looking to get started."

At a hearing on the defendants' post-trial motions, the trial judge stated that the GTECH attorney had requested that the prosecution be prohibited from mentioning GTECH by name in its opening statement. The judge said that he had responded, "What kind of fool are you? You can't take that position. You're not a party to the proceeding. Goodbye, gentlemen." In ruling on the post-trial motion, the judge reiterated, "[n]othing changed at all, not even an iota, as a result of that meeting."

■ Due process mandates that a criminal defendant have an opportunity to attend any proceeding where his presence has a "relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (internal quotations omitted). *See also* Fed.R.Crim.P. 43(a) ("defendant shall be present ... at every stage of the trial"). A defendant's presence is a condition of due process, however, only "to the extent that a fair and just hearing would be thwarted by his absence." *Gagnon*, 470 U.S. at 526, 105 S.Ct. 1482.

■ In the final analysis, defendants have failed to show that they were prejudiced by this pre-trial meeting. The unavoidable conclusion is that their presence would not have contributed anything. We see no particular reason why they would have argued in favor of having GTECH go unnamed. As was true in *Gagnon*, defendants "could have done nothing had they been at the conference, nor would they have gained anything by attending." *Id.* at 527, 105 S.Ct. 1482. The encounter was but "a short interlude in a complex trial." *Id.* On this record, we fail to see how this meeting deprived defendants of a fair trial and, accordingly, find no reversible error.

■ Yet, we confess considerable unease as to why this incident even occurred. Once it became clear that the GTECH attorney wished to speak about the forthcoming trial, the judge should have terminated all discussion until defense counsel were present. Although in this instance, GTECH's request was fatuous and naive, under other circumstances, such a meeting could lead to more serious and perhaps prejudicial matters. We understand the trial judge's virtual certainty that nothing adverse had or would occur during this two-minute "interlude." Nevertheless, any doubt on that score could easily have been eliminated by calling in defense counsel. This is the type of situation in which perception is as important as reality. Because such incidents can foster suspicion and distrust, they should be scrupulously avoided.

## IV.

■ Both defendants were convicted of four offenses—conspiracy to defraud, interstate transportation of stolen property,

causing unlawful interstate travel with intent to distribute stolen property, and money laundering. At the first stage of the sentencing process, these counts were grouped into a single unit under U.S.S.G. § 3D1.2(b) (1997) (requiring grouping when "counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan"). GTECH was the "same victim" and all transactions were connected to the kickback scheme. The grouping, therefore, was appropriate and is not challenged in this appeal. *See United States v. Cusumano,* 943 F.2d 305, 312 (3d Cir.1991); *see also United States v. Leonard,* 61 F.3d 1181, 1185–86 (5th Cir.1995). *But cf. United States v. Napoli,* 179 F.3d 1, (2d Cir. 1999); *United States v. Johnson,* 971 F.2d 562, 576 (10th Cir.1992).

Having grouped the offenses, the sentencing judge was instructed by U.S.S.G. § 3D1.4 to use the highest offense level corresponding to the counts in the unit. The money laundering counts carried an offense level of twenty, U.S.S.G. § 2S1.1(a)(2), while the fraud charge carried a level of six, U.S.S.G. § 2F1.1(a).[2] The sentencing judge chose the laundering violation level. Smith was thus exposed to a range of 57—71 months and received a sentence of 63 months imprisonment. Dandrea fell within a bracket of 30—37 months and received 30 months.[3]

▮ In determining sentences, courts consult the Statutory Index, Appendix A to the Guidelines Manual for a list of guidelines that correspond to the statute of conviction. *See* U.S.S.G. § 1B1.2(a) and App. Note 1. If, however, "in an atypical case," the guideline indicated for the statute of conviction is "inappropriate because of the particular conduct involved," the court is instructed to use the guideline "most applicable to the nature of the offense conduct charged." Appendix A at 417 (Introduction).

Appendix A thus sets up a two-step inquiry:

1.  Does the designated guideline apply or is the conduct "atypical" in comparison to that usually punished by the statute of conviction; and

2.  If the conduct is "atypical," which guideline is more appropriate?

*See United States v. Voss,* 956 F.2d 1007, 1009 (10th Cir.1992), superceded in part on other grounds by amendment to U.S.S.G. § 2D1.1.

In this case, the sentencing judge was deeply concerned about which guideline to apply and whether to depart. After an extended hearing, and with obvious reluctance, he concluded that the money laundering guideline should apply as opposed to that for fraud and that there should be no departure.

▮ Our standard of review is an important factor. A refusal to depart where the sentencing court recognized that it had authority to do so, as was true in this case, is unreviewable. *United States v. Georgiadis,* 933 F.2d 1219, 1222 (3d Cir.1991). The initial choice of guideline, however, is a question of law subject to plenary review. *United States v. Eversley,* 55 F.3d 870, 871 (3d Cir.1995); *see also United States v. Henry,* 136 F.3d 12, 19–20 (1st Cir.1998); *United States v. Rubin,* 999 F.2d 194, 197 (7th Cir.1993).

▮ In making its selection, the sentencing court must determine if the

---

2. The base offense level under U.S.S.G. § 2F1.1 is six, subject to additional points based on the loss amount. Here, because the fraud resulted in a loss of more than $120,000.00, seven points would have been added to produce an offense level of 13. *See* U.S.S.G. § 2F1.1(b)(1)(H).

3. Smith's sentence was based on a criminal history category I, and offense level 25 (twenty for money laundering, one for value of funds, two for role, and two for abuse of trust). Dandrea's sentence was based on a criminal history category I and offense level 19 (twenty for money laundering, plus one for value of funds, minus two for minor role.).

conduct being punished falls within the particular guideline's " 'heartland,' a set of typical cases embodying the conduct" described in each guideline. U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b); *see also Koon v. United States*, 518 U.S. 81, 93–94, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). This determination is a legal function that requires the court to interpret the guideline in light of its intention or purpose. As the Court explained in *United States v. LeBlanc*, a decision that offenses fell outside the "heartland" involved "categorical, legal conclusions centered on the intent and scope of the money laundering statutes, and thereby, the nature of the applicable sentencing guideline's heartland [. This presents] a quintessentially legal question ... subject to plenary review." 24 F.3d 340, 345 (1st Cir.1994).

■ A sentencing court may be required to perform a "heartland" analysis in two different circumstances—the first, during the initial choice of the appropriate guideline; the second, in the context of a departure request. Although these situations arise at different stages of the sentencing process and are distinguishable to that extent, the "heartland" analysis remains identical.

■ To address the defendants' contention of error, we must first determine what conduct the Sentencing Commission considered to fall within the "heartland" of the money laundering guideline. A "heartland" analysis should include reference to the statute of conviction, *see LeBlanc*, 24 F.3d at 346, but, as will be explained, U.S.S.G. § 2S1.1 has a unique background. Despite the money laundering statutes' apparent broad reach, the history of U.S.S.G. § 2S1.1 suggests that its heavy penalty structure was addressed to the activity detailed in the statute's legislative history—namely, the money laundering associated with large scale drug trafficking and serious crime. For this reason, we concentrate on the guideline rather than the statute of conviction in order to delineate the "heartland" of U.S.S.G. § 2S1.1.

■ We are aided to an unusual extent in this inquiry by the pronouncements of the Commission itself. Unlike almost all of the offenses covered by the Guidelines, money laundering lacked a body of statistical evidence to establish the typical sentence. United States Sentencing Commission, Report to the Congress: Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report at 3 & n.2 (Sept. 18, 1997).

When U.S.S.G. § 2S1.1 was adopted, the money laundering statutes, 18 U.S.C. §§ 1956 and 1957, had been in effect for only six months. *Id.* For that reason, the Commission chose a high offense level to punish the activity which had aroused congressional concern: "1) situations in which the 'laundered' funds derived from serious underlying criminal conduct such as a significant drug trafficking operation or organized crime; and, 2) situations in which the financial transaction was separate from the underlying crime and was undertaken to either: a) make it appear that the funds were legitimate, or b) promote additional criminal conduct by reinvesting the funds in additional criminal conduct." *Id.* at 4.

When other offenses were also prosecuted, the penalty levels of U.S.S.G. § 2S1.1 were not tied to the seriousness of the underlying crime. This created a punishment structure in which "sentences for money laundering offenses were substantially greater than those for the less serious crimes that produced the laundered proceeds (*e.g.*, minor fraud)." *Id.* Coupled with the unexpectedly broad application of the money laundering statutes, the penalty provisions compelled severe sentences for "money laundering conduct [ ] so attenuated as to be virtually unrecognizable as the type of conduct for which the original money laundering sentencing guidelines were drafted." *Id.* at 6–7.

The money laundering guideline was roundly criticized. Judges, dissatisfied

with its unwarranted harshness in particular cases, avoided the disparities by routinely granting departures. *Id.* at 8–9. The Commission ultimately responded by proposing amendments to the guideline in 1995. The changes aimed to provide penalties more proportionate to "both the seriousness of the underlying criminal conduct," and to "the nature and seriousness of the laundering conduct itself." *United States v. Woods*, 159 F.3d 1132, 1135 (8th Cir.1998) (internal quotations omitted).

Congress, however, did not approve the amendments, asserting that the "broad changes" proposed "will send a dangerous message that money laundering associated with drug and other serious crimes is not viewed as the grave offense it once was." H.R.Rep. No. 104–272, at 14–15, *reprinted in* 1995 U.S.C.C.A.N. 335, 348–49. The House Report did, however, recognize that "the application of the current guidelines to receipt-and-deposit cases, *as well as to certain other cases that do not involve aggravated money laundering activity,* may be problematic." *Id.* at 348 (emphasis added). Nevertheless, "past sentencing *anomalies* arising from relatively few cases do not justify a sweeping downward adjustment in the money laundering guidelines." *Id.* at 349 (emphasis added).

As we read the Report, Congress wished to reiterate the seriousness of its concern over money laundering that is associated with drug trafficking and serious crimes. However, by characterizing the draconian sentences in the other cases cited by the Commission as "anomalies," the House Judiciary Committee seemed to intimate that such cases should be controlled by the courts. *See Woods*, 159 F.3d at 1135.

Congress also asked the Justice Department to report on its money laundering prosecution practices. *See* 28 U.S.C. § 994 Note. The Department responded that the money laundering statutes "should not be used in cases where the money laundering activity is minimal or incidental to the underlying crime." *See* Department of Justice, Report for the Senate and House Judiciary Committees on the Charging and Plea Practices of Federal Prosecutors with Respect to the Offense of Money Laundering, at 14 (June 17, 1996).

Whether that policy has been uniformly followed, however, is subject to some doubt, as illustrated by the indictments in this case as well as those in *Woods, United States v. Hemmingson,* 157 F.3d 347 (5th Cir.1998), *United States v. Buchanan,* 987 F.Supp. 56 (D.Mass.1997), and *United States v. Caba,* 911 F.Supp. 630 (E.D.N.Y.), *aff'd,* 104 F.3d 354 (2d Cir. 1996) (table), and others. *See also* News from the U.S. Sentencing Commission, "Money Laundering Guidelines Scrutinized," at 2, 8 (Jan.1998) ("[T]here can be an 85–to–95 percent increase in penalties for the same offense conduct if money laundering is charged in addition to an underlying fraud offense.").

In *United States v. Woods,* the Court of Appeals for the Eighth Circuit reviewed at length the Report of the Sentencing Commission and its rejection by Congress. The Court concluded that Congress did not intend to prohibit downward departures where the offense at issue was outside the heartland of the money laundering guidelines. 159 F.3d at 1135–36. The Court therefore affirmed the District Court's conclusion that it was more appropriate to sentence the defendant under the bankruptcy fraud guideline rather than the money laundering guideline. *Id.* at 1133–34, 1136.

Similarly, the Court of Appeals for the Fifth Circuit in *United States v. Hemmingson* approved the District Court's. determination that the defendants' campaign contribution offenses were outside the heartland of the money laundering guideline. 157 F.3d at 359. The fact that the money laundering statute facially applied to the defendants' activity was insufficient to mandate application of U.S.S.G. § 2S1.1 because their conduct, when viewed along-

side that usually prosecuted under the statute, was atypical. *Id.* at 362.

We are aware that other cases have produced differing results, but find them distinguishable. In *United States v. Cusumano,* we upheld the sentencing judge's decision to apply the money laundering guideline rather than the one for embezzlement. 943 F.2d at 313–14. That opinion, however, was filed before the Commission issued its Report to Congress, in which it explained the heartland of the money laundering guideline. *Cusumano,* therefore, is not an on-point precedent that binds this panel. *See also United States v. Powers,* 168 F.3d 741, 753 (5th Cir.1999) (containing no analysis of U.S.S.G. § 2S1.1 because court lacked jurisdiction over district court's refusal to depart); *United States v. Adams,* 74 F.3d 1093, 1102 (11th Cir.1996) (listing cases but providing little analysis of the money laundering guideline's history).

Ultimately, we conclude that the Sentencing Commission itself has indicated that the heartland of U.S.S.G. § 2S1.1 is the money laundering activity connected with extensive drug trafficking and serious crime. That is not the type of conduct implicated here.

■■■ In this case, the money laundering convictions were based on 15 checks sent by Benchmark to Smith's creditors. This left a paper trail, conduct inconsistent with planned concealment. *See Caba,* 911 F.Supp. at 636. The money laundering activity, when evaluated against the entire course of conduct, was an "incidental by-product" of the kickback scheme. *See Henry,* 136 F.3d at 20; *see also* Report on Charging and Plea Practices, *supra,* at 14. The root of the defendants' activity in this case was the fraud on GTECH.

As the sentencing judge remarked, "What did [Dandrea] do to disguise [the source of the funds] .... [t]he only thing he did was make out a check to whoever Smith told him to make out the check to." As for Smith, even recognizing that the jury must have thought that he was trying to conceal the scheme by having checks made payable to his creditors rather than to himself, *see* 18 U.S.C. § 1956(a)(1)(B)(i), that conduct is not within the heartland of the money laundering guideline for sentencing purposes. Smith's disingenuous efforts towards a cover-up fall far short of the large scale drug money laundering or serious crime contemplated by the Sentencing Commission when it drafted U.S.S.G. § 2S1.1.

To use the money laundering guideline in this routine fraud case would let the "tail wag the dog." As the Court said in *United States v. Kuku,* 129 F.3d 1435, 1440 (11th Cir.1997), "strict focus on the technicalities of the sentencing process obscures the overarching directive to match the guideline to the offense conduct which formed the basis of the underlying conviction." We are convinced that this case presents one of those anomalies that Congress intended the courts to deal with fairly. To fulfill that obligation, we direct the use of the fraud guidelines rather than that for money laundering.

Accordingly, we will vacate the sentences of both defendants and remand for resentencing.[4] In all other respects, the judgments of the District Court will be affirmed.

---

4. Smith argues that the sentencing court left unresolved a disputed issue of fact over the amount of laundered funds. Adoption of the Presentence Report, however, which contained a recommended amount, resolves that fact. *See United States v. Console,* 13 F.3d 641, 674 (3d Cir.1993). That amount may be used to determine the base offense level under U.S.S.G. § 2F1.1(b)(1).