UNITED STATES of America,
Appellee,

v.

Stephen J. SABBETH, Defendant–
Appellant,

Carole Sabbeth, also known as
Carole Fiore, Defendant.

Docket No. 00–1586.

United States Court of Appeals,
Second Circuit.

Argued July 11, 2001.

Decided Aug. 21, 2001.

**210**

Lewis J. Liman, (Adam M. Abensohn, of counsel), Wilmer, Cutler & Pickering, New York, NY, for Defendant–Appellant.

Charles S. Kleinberg, Assistant United States Attorney (Susan Corkery, David C. James, Assistant United States Attorneys, of counsel; Loretta E. Lynch, United States Attorney, on the brief), United States Attorney's Office for the Eastern District of New York, Brooklyn, NY, for Appellee.

Before: WALKER, Chief Judge, CABRANES and STRAUB, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

Following a jury trial, defendant Stephen Sabbeth was convicted in the United States District Court for the Eastern District of New York (Denis R. Hurley, *Judge* ) of conspiracy to commit bankruptcy fraud, in violation of 18 U.S.C. § 371; bankruptcy fraud, in violation of 18 U.S.C. § 152(7); making false oaths in relation to a bankruptcy proceeding, in violation of 18 U.S.C. § 152(2); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). On appeal, he challenges his conviction and sentence by arguing that (1) the District Court applied an erroneous definition of "property of . . . [a] corporation" under 18 U.S.C. § 152(7); (2) the District Court applied an erroneous definition of "fraudulently" for purposes of the false-oath counts; (3) the indictment was defective with respect to the money-laundering count because it failed to include "an effect on interstate commerce" as an element of the offense; (4) the District Court should have calculated his sentence for the money-laundering count by using the provision of the Sentencing Guidelines applicable to fraud rather than the provision applicable to money laundering; and (5) the District Court should have grouped his fraud and money laundering offenses under Section 3D1.2 of the Sentencing Guidelines.

For the reasons stated below, we find all of these arguments to be without merit and therefore affirm.

## I. Background

The following facts are drawn from the record and viewed in the light most favorable to the Government. *See Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

Stephen Sabbeth was the president and sole shareholder of Sabbeth Industries, Ltd. ("SIL" or "Sabbeth Industries"), a family-run lumber company located in Deer Park, New York. Sabbeth was also SIL's landlord, and he periodically lent money to the corporation.

SIL's primary source of financing was a line of credit provided jointly by National Westminster Bank and Manufacturers Hanover Trust, Co. (collectively, the "Banks"), the outstanding balance of which

ranged between $14 million and $18 million during the period from July 1989 to September 1990. As collateral for this line of credit, the Banks held a security interest in all of SIL's assets and a personal guarantee from Sabbeth that he would pay all outstanding obligations under the line of credit.

In 1988, the lumber market began to decline, and SIL fell into arrears on its loans. To pay down the line of credit with the Banks, Sabbeth mortgaged his home and loaned the proceeds to SIL for payment to the Banks. Because SIL owed Sabbeth approximately $2 million for past-due obligations, Sabbeth also executed two subordination agreements with National Westminister Bank, in which he agreed to receive payment from SIL for past (and any future) debt obligations only if the line of credit was paid in full. Despite Sabbeth's efforts, SIL suffered a complete financial collapse by the middle of 1989.

In November 1989, Sabbeth met with representatives of the Banks to discuss SIL's financial predicament. The representatives expressed grave concerns about SIL's financial well-being and indicated that the Banks might consider liquidating SIL in the near future. To allay their concerns, Sabbeth agreed to meet each month with the Banks' representatives to monitor SIL's finances and to determine whether SIL would need to file for bankruptcy.

Soon after the November 1989 meeting, Sabbeth devised a scheme to transfer SIL's remaining assets to himself and his wife, Carole Sabbeth. From June 1 to December 28, 1990, Sabbeth withdrew over $750,000 from SIL and deposited this money into five different accounts under his or his wife's name (the "initial transfers"). Sabbeth accomplished these initial transfers by writing approximately 55 non-payroll checks to himself on behalf of SIL.

Once the money was in his or his wife's accounts, Sabbeth transferred the money into secret accounts that he had set up using his wife's maiden name, his mother-in-law's home address, and false social security numbers (the "subsequent transfers"). Many of these subsequent transfers were made in cash amounts of less than $10,000 to avoid currency-reporting requirements. *See* 31 C.F.R. § 103.22(a) (requiring a bank to report to the IRS any cash transaction of $10,000 or more); 31 U.S.C. § 5313(a) (similar); 31 U.S.C. § 5324 (making it a crime for an individual to structure a financial transaction to avoid the filing requirements of 31 U.S.C. § 5313).

Prior to November 1990, the Banks were unaware that Sabbeth had been writing non-payroll SIL checks to himself. After learning about some of these checks, representatives of the Banks confronted Sabbeth on a number of occasions; however, each time he was confronted, Sabbeth told the representatives that he no longer had the transferred money.

On December 28, 1990, SIL filed for bankruptcy under Chapter 11. At the time of the filing, Sabbeth had over $1 million in his secret accounts, all of which had previously belonged to SIL.

During the course of the bankruptcy proceeding, National Westminister Bank hired a law firm to investigate SIL's finances. By the end of 1991, the law firm discovered that Sabbeth had withdrawn over $1 million of assets from SIL and was holding these funds in secret accounts. This discovery led National Westminister Bank to commence an action in state court in December 1991 for fraudulent conveyance, seeking to attach the funds in the secret accounts. A few months later, SIL commenced a preference action in bankruptcy court to recover the same monies.

Both actions were eventually tried together before the bankruptcy court.

Sabbeth submitted an affidavit admitting that the SIL checks that he had written to himself were voidable preference payments; however, he testified that he had written them anyway to restore some financial security to his wife. Sabbeth also testified that two employees of National Westminister Bank knew of the payments, and that one had even approved of them. Finally, he claimed that the false social security number on the secret accounts was a "mistake," and that his wife had tried to correct the error.[1] At the end of the proceedings, the bankruptcy court held that the transfers between SIL and Sabbeth were preference payments—though not necessarily fraudulent conveyances—and required Sabbeth to return the remaining monies to the bankruptcy estate.

By indictment dated May 7, 1997, a federal grand jury charged Sabbeth with one count of conspiracy to commit bankruptcy fraud, in violation of 18 U.S.C. § 371; one count of bankruptcy fraud, in violation of 18 U.S.C. § 152(7); three counts of making false oaths in relation to a bankruptcy proceeding, in violation of 18 U.S.C. § 152(2); and one count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

On March 3, 1999, following a four-week trial, a jury found Sabbeth guilty of all six counts; and on July 21, 2000, the District Court sentenced Sabbeth principally to 97 months' imprisonment, 3 years' supervised release, restitution in the amount of $125,000, and a special assessment of $300.[2]

Judgment was entered accordingly, and this timely appeal followed.

## II. CHALLENGES TO CONVICTION

On appeal, Sabbeth challenges his conviction on three bases, each of which we consider in turn.

### A. Definition of "Property of ... [a] Corporation" Under 18 U.S.C. § 152(7)

Sabbeth's first claim is that the District Court constructively amended the indictment by using an erroneous definition of "property of ... [a] corporation" in the jury instructions on the bankruptcy-fraud count, 18 U.S.C. § 152(7).

Section 152(7) makes it unlawful for any person, in contemplation of his bankruptcy or that of another person or corporation, to transfer or conceal knowingly and fraudulently "his property or the property of such other person or corporation." 18 U.S.C. § 152(7).[3] By its plain language, therefore, Section 152(7) makes it a crime

---

1. These statements would later serve as the basis of Sabbeth's conviction for making false oaths in relation to a bankruptcy proceeding.

2. More precisely, the District Court sentenced Sabbeth to 60 months' imprisonment for each count of conviction other than the money-laundering count, for which he was sentenced to 97 months' imprisonment. The District Court imposed each of the sentences concurrently, for a total term of 97 months.

3. Section 152(7) provides in relevant part:
 A person who—
 . . .

(7) in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of *his property or the property of such other person or corporation;*

 . . .
 shall be fined under this title, imprisoned not more than 5 years, or both.
18 U.S.C. § 152(7) (emphasis added).

for a person to transfer or conceal knowingly and fraudulently either (1) his property; (2) the property of another person; or (3) the property of a corporation.

In the case at hand, Sabbeth was charged with violating and conspiring to violate Section 152(7) by fraudulently transferring and concealing "property belonging to Sabbeth Industries" in contemplation of Sabbeth Industries's bankruptcy. He was therefore charged with transferring or concealing "the property of ... [a] corporation," not with transferring or concealing "his property" or "the property of ... [another] person." The District Court instructed the jury accordingly and explained that, to convict Sabbeth of the bankruptcy-fraud counts, it had to find that Sabbeth had fraudulently transferred or concealed the "property of Sabbeth Industries."

The question presented here is whether the District Court's definition of "property of Sabbeth Industries" was proper. In its instructions to the jury, the District Court defined the "property of Sabbeth Industries" as follows:

> The property of Sabbeth Industries consists of any legal or equitable interest in property held by Sabbeth Industries. It includes any corporate property transferred to defendant during 1990 before the bankruptcy petition was filed on December 28, 1990, which property—but for the transfer or transfers—would have been included in the bankruptcy estate of Sabbeth Industries. Sums, if any, paid to defendant for past due interest or past due rents—that is for antecedent debt(s)—would constitute property for purposes of Section 152 if the payment or payments were made while the corporation was insolvent; conversely, monies, if any, paid to defendant by Sabbeth Industries for current obligations, such as for current rent or current interest, would not have been property of the bankruptcy estate upon the filing of the bankruptcy petition, but rather would have been defendant's property.

*United States v. Sabbeth,* 125 F.Supp.2d 33, 40 (E.D.N.Y.2000).

Sabbeth argues that this definition was erroneous because it permitted the jury to convict Sabbeth of violating Section 152(7) for fraudulently transferring "his property"—of which he was not charged—rather than the "property of Sabbeth Industries." The District Court's definition of "property of Sabbeth Industries" essentially includes all property that SIL would have had *but for* a preferential transfer or fraudulent conveyance. According to Sabbeth, this definition is too broad because once an individual transfers property from a corporation to himself—even if that transfer can later be voided as a preferential transfer or a fraudulent conveyance—that property belongs to that individual and ceases to belong to the corporation.

Sabbeth therefore concedes that the checks that he wrote to himself could be characterized as preference payments; however, he claims that until SIL successfully brought an action to void these transfers as preference payments, the transferred monies were "his property" for purposes of Section 152(7). *See generally SEC v. Levine,* 881 F.2d 1165, 1176 (2d Cir.1989) ("Under New York law, the culpable party to a voidable transaction acquires title, albeit voidable title, to the property he has received."); *Reynolds v. Allstate Ins. Co.,* 629 F.2d 1111, 1115 (5th Cir.1980) ("A voidable title remains a valid one until such time as the party, in whom the power of nullification exists, moves to have the title invalidated."). According to Sabbeth, therefore, the subsequent transfers of monies from his accounts to his secret accounts could not result in a Sec-

tion 152(7) conviction here because, as a matter of law, these monies belonged to him.[4] Sabbeth argues that, by permitting him to be convicted for these transfers, the District Court's definition of "property of ... [a] corporation" impermissibly expanded the scope of the indictment, and that, therefore, his convictions for conspiracy to commit bankruptcy fraud, bankruptcy fraud, and money laundering should be reversed.[5]

We are not persuaded. As the Supreme Court has observed, "it is impossible to give any categorical definition to the word 'property.'" *Kokoszka v. Belford*, 417 U.S. 642, 645, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974) (brackets and citation omitted). Its meaning must therefore be determined by looking at the purpose of the statutory provision to which it belongs. *Cf. id.* (interpreting the term "property" under Section 70a(5) of the Bankruptcy Act by this method).[6] We conclude that Sabbeth's interpretation of "property of ... [a] corporation" is directly contrary to the purpose of Section 152(7).

■ Congress enacted Section 152 and its predecessor statute—11 U.S.C. § 52(b)—to prevent and punish efforts to defeat the provisions of Title 11, *see Unit-*

*ed States v. Shapiro*, 101 F.2d 375, 379 (7th Cir.1939) (interpreting the predecessor statute), including the rule that "creditors of equal priority should receive pro rata shares of the debtor's property," *Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). A defendant who fraudulently transfers assets that rightfully belong to a corporation about to file for bankruptcy undermines this pro rata distribution of assets, by making it difficult for creditors to locate and properly distribute these assets. It should not make a difference that a defendant first transfers the corporation's assets to his own account before distributing them to others; yet, Sabbeth's interpretation of "property of ... [a] corporation" leads precisely to this result. If, as Sabbeth suggests, a corporation's assets cease to be "property of ... [a] corporation" after the assets have been preferentially or fraudulently transferred to a defendant, that defendant could not be charged with fraudulently transferring "property of ... [a] corporation" under Section 152(7) for the subsequent transfer of these assets, even though these transfers would directly and obviously undermine the pro rata distribution of assets in bankruptcy. Because such a proposition is

4. To emphasize this point to the jury, Sabbeth requested the District Court to instruct the jury that

[t]ransfers or concealment of property that you find belonged to ... Sabbeth cannot support a finding of guilt.... Thus, if you find that [SIL] made payments to Stephen Sabbeth on account of a debt or obligation it owed him, then any subsequent transfer or concealment of that money does not constitute a transfer or concealment of the property of [SIL], and you must return a verdict of not guilty.

5. The indictment charged Sabbeth with laundering the monies that he had unlawfully obtained through bankruptcy fraud. Because the indictment was phrased in this manner, Sabbeth argues that any error in the District

Court's definition of "property of ... [a] corporation" under the bankruptcy-fraud statute necessarily affected his conviction for money laundering. We do not need to reach this issue because we conclude that the District Court's definition of "property of ... [a] corporation" was proper.

6. Because the parties do not argue otherwise, we apply federal law—rather than state law—in interpreting 18 U.S.C. § 152(7), a federal criminal statute. *See generally Jerome v. United States*, 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1943) ("[W]e must generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law.").

unreasonable on its face, the phrase "property of ... [a] corporation" must be read to include any property that the corporation would possess *but for* a defendant's preferential or fraudulent transfer. Such an interpretation of "property of ... [a] corporation" best conforms with the unambiguous purpose of Section 152(7).

Sabbeth argues that his reading of Section 152(7) does not lead to absurd results because the Government could always charge a defendant with fraudulently transferring *both* "his property" and "property of ... [a] corporation." Sabbeth also argues that our reading of "property of ... [a] corporation," which includes certain properties held illegitimately by a defendant, would render the phrase "his property" superfluous.

■ We disagree. Section 152(7) applies to three situations: (1) where a defendant declares bankruptcy, (2) where a person other than the defendant declares bankruptcy, and (3) where a corporation declares bankruptcy. The phrases "his property," "property of ... [another] person," and "property of ... [a] corporation" refer, respectively, to these three situations. Accordingly, it is not likely that the phrase "his property" was included in Section 152(7) so that the Government could charge a defendant with fraudulently transferring both "his property" and "property of ... [a] corporation" in contemplation of a corporation's bankruptcy. Instead, it appears that the phrase "his property" was included so that the Government could charge a defendant with fraudulently transferring "his property" when he does so in contemplation of *his own* bankruptcy.

Moreover, our reading of "property of ... [a] corporation" does not render the phrase "his property" superfluous. If a defendant committed bankruptcy fraud in the course of his own bankruptcy, the indictment presumably would charge him with fraudulently transferring or concealing "his property." In this context, the phrase "his property" has a meaning that is plainly different from the phrase "property of ... [a] corporation." Accordingly, we do not need to interpret "property of ... [a] corporation" in the manner suggested by Sabbeth to provide meaning to the phrase "his property."

■ Sabbeth next argues that his interpretation of "property of ... [a] corporation" conforms with our prior interpretation of Section 541 of the Bankruptcy Code, 11 U.S.C. § 541, which defines the "property of the [debtor's] estate." *See FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 130–32 (2d Cir.1992) (holding that "property of the estate" excludes assets that have been transferred because of a preferential transfer or a fraudulent conveyance until those assets have been recovered). Yet, the purpose of Section 541, which defines the contours of the bankruptcy estate, is entirely different from that of Section 152(7), which criminalizes bankruptcy fraud. One of the primary purposes of Section 541 is to define what a trustee can and cannot distribute to a bankruptcy estate's creditors. In that context, a definition of "property of the estate" that excludes preferential and fraudulent conveyances is understandable because a trustee cannot distribute property that it does not yet possess.[7] On the other hand, Section 152(7) is designed to

---

7. We note, however, that a trustee may be able to assign—or "distribute"—the *right* to recover property that it does not yet possess. *See, e.g., Commodore Electronics Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96 (2d Cir.2001) (holding that a creditors' committee may sue on behalf of the debtors under certain circumstances).

prevent individuals prior to a bankruptcy proceeding from fraudulently transferring funds that legitimately belong to the debtor's estate. The very purpose and context of Section 152(7) requires a broader reading of the word "property" of the debtor's estate than that employed for Section 541; "property" under Section 152(7) must include all property that would have belonged to the debtor but for a preferential or fraudulent transfer by the defendant. Moreover, the fact that Congress used different words in each provision—"property of . . . [a] corporation" versus "property of the estate"—suggests that Congress had different meanings in mind when enacting the two provisions. *Cf. Nobelman v. American Sav. Bank,* 508 U.S. 324, 331, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (using similar reasoning to interpret Section 1322(b)(2) of the Bankruptcy Code). Accordingly, "[w]e will not give the plain wording and meaning of [Section 152(7)] the strained, hypertechnical reading urged by [the defendant]." *United States v. Moody,* 923 F.2d 341, 347 (5th Cir.1991).

In sum, we hold that in the context of a bankruptcy proceeding of a corporation, "property of . . . [a] corporation" under Section 152(7) includes all property that would have belonged to the debtor's estate but for a preferential transfer or fraudulent conveyance by a defendant. We believe that such a commonsensical reading of Section 152(7) conforms with the purpose and text of that provision.[8]

Because Sabbeth's challenge to his convictions for bankruptcy fraud and for conspiracy to commit bankruptcy fraud rest on his imaginative, but erroneous, interpretation of "property of Sabbeth Industries," we find no basis to reverse either of these convictions.[9]

### B. *Jury Instruction on False–Oath Counts*

Sabbeth next challenges the jury instructions on the false-oath counts. Sabbeth was found guilty of three counts of "knowingly and fraudulently" making a false oath or account in a Chapter 11 bankruptcy proceeding, in violation of 18 U.S.C.

---

**8.** Sabbeth argues that our reading of "property of . . . [a] corporation" would authorize a jury to convict a defendant of bankruptcy fraud for transfers that are not fraudulent. He seems to forget, however, that "property of . . . [a] corporation" is only one element of bankruptcy fraud under Section 152(7). As the District Court's jury instructions explained, in addition to proving that a defendant has taken "property of . . . [a] corporation," the Government must show that the defendant acted knowingly and *fraudulently* and with the intent of defeating the provisions of Title 11. Accordingly, our reading of "property of . . . [a] corporation" does not permit a defendant to be convicted of bankruptcy fraud for non-fraudulent transactions.

**9.** Sabbeth challenges his money-laundering conviction on three grounds, one of which is based on his erroneous interpretation of "property of . . . [a] corporation." *See ante* note 5. We address another of his arguments in Section II.C, *post.* Sabbeth's third argument is that the District Court's definition of

"property of Sabbeth Industries" permitted the jury to find him guilty of committing both bankruptcy fraud and money laundering for engaging in the same subsequent transactions. According to Sabbeth, this finding would violate the rule that money laundering must involve proceeds of a separate crime. *See United States v. Napoli,* 54 F.3d 63, 67 (2d Cir.1995).

This argument is without merit. The subsequent transfers consisted of a *series* of financial transactions. There was nothing to prevent the jury from concluding that one of the subsequent transfers was bankruptcy fraud and that a *later* subsequent transfer was money laundering. Accordingly, we find no basis to conclude that the jury misunderstood the District Court's instructions, which explained that the jury could convict Sabbeth of money laundering only if it found that the money laundering involved proceeds of bankruptcy fraud.

§ 152(2).[10] At trial, the District Court instructed the jury that "an act is done with intent to defraud if it is done with the intent to deceive any creditor, trustee, or bankruptcy judge." Sabbeth argues that this definition of "intent to defraud" (*i.e.,* "fraudulently") is erroneous because one must do more than merely "deceive" in order to "defraud"; according to Sabbeth, one "defrauds" only where he deceives *in order to deprive another of a right, interest, or property.* In other words, Sabbeth contends that a defendant can be convicted of making a false oath at a bankruptcy proceeding only if he makes a false statement with the specific intent of altering the distribution of another's assets.

The Court of Appeals for the Seventh Circuit rejected this very argument in *United States v. Gellene,* 182 F.3d 578, 586–87 (7th Cir.1999). In that case, the Court upheld a jury instruction explaining that a statement is made "fraudulently" for purposes of Section 152 if it is made "with [an] intent to deceive," and rejected the argument that Section 152 is limited "to false statements that deprive the debtor of *his property* or the bankruptcy estate *of its assets." Id.* at 586 (emphasis added). According to the Court, " § 152 is designed to protect the integrity of the administration of a bankruptcy case" and not simply the property interest of the parties. *Id.* at 587. Accordingly, it held that the district court's jury instructions did not need to include specific references to the potential impact on the disposition of assets. *See id.* at 588.

We adopt the Seventh Circuit's reasoning here. The plain language of the false-oath provision punishes a person for making a false statement "knowingly and fraudulently." The common understanding of the term "fraudulently" includes the

intent to deceive. *See* BLACK'S LAW DICTIONARY 662 (6th ed. 1990) ("A statement . . . is 'fraudulent' if it was falsely made, or caused to be made, with *the intent to deceive.*" (emphasis added)). Moreover, the Seventh Circuit's reasoning is consistent with our own precedent. We held long ago that Section 152 is "essentially equivalent to a perjury statute," and that "only the basic requirements of perjury need be proven." *In re Robinson,* 506 F.2d 1184, 1189 (2d Cir.1974).

Accordingly, we hold that the District Court was not required to instruct the jury that a false oath must be made with the intent to deprive a third party of a right, interest, or property. It was sufficient for the District Court to define "fraudulently" as "made 'with the intent to deceive.' "

C. *Sufficiency of the Indictment*

Sabbeth's final challenge to his conviction concerns the sufficiency of the indictment with respect to the charge of money laundering. The Government concedes that the indictment failed explicitly to mention an essential element of a money-laundering offense—namely, that the money-laundering activity must have had an effect on interstate or foreign commerce. *See United States v. Goodwin,* 141 F.3d 394, 401 (2d Cir.1997). The issue here is whether, as Sabbeth argues, this omission constitutes a basis to reverse his conviction.

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an "indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." FED.R.CRIM.P. 7(c)(1). We have also explained that an "indictment must sufficiently inform the defendant of

---

**10.** Section 152(2) makes it a crime for a person to "knowingly and fraudulently make[ ] a false oath or account in or in relation to any case under title 11." 18 U.S.C. § 152(2).

the charges he must meet and must provide enough detail so that the defendant may plead double jeopardy in a future prosecution based on the same set of events." *Goodwin,* 141 F.3d at 401 (internal quotation marks omitted). However, an indictment need not be perfect, and common sense and reason prevail over technicalities. *See id.* at 401. *See generally Smith v. United States,* 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959) ("Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused.").

■■■■ The scrutiny given to an indictment depends, in part, on the timing of a defendant's objection to that indictment. *See Goodwin,* 141 F.3d at 401; *United States v. Wydermyer,* 51 F.3d 319, 324 (2d Cir.1995). Where a defendant raises an objection after a verdict has been rendered, we have held that an indictment should be interpreted liberally, in favor of sufficiency. *See Wydermyer,* 51 F.3d at 324–25. Specifically relevant to the case at hand, we have also held that an indictment that charges a defendant with money laundering, but that does not explicitly allege a nexus with interstate or foreign commerce, is sufficient where a defendant fails to challenge the indictment before or during trial and where the defendant has suffered no prejudice as a result of the omission. *See Goodwin,* 141 F.3d at 401–02.

Here, Sabbeth did not challenge the sufficiency of the indictment before trial or early in the proceedings at trial; however, he did raise an objection at the close of the Government's case at trial. Sabbeth argues that this challenge was timely because it was made "before or during trial," *Goodwin,* 141 F.3d at 401; therefore, he contends, we should construe the sufficiency of his indictment restrictively, rather than liberally.

■■ We are not persuaded. In *Goodwin* and *Wydermyer,* the defendant had not challenged the sufficiency of his indictment "before or during trial," and we held in such circumstances that the sufficiency of an indictment should be interpreted liberally in favor of sufficiency. *Goodwin,* 141 F.3d at 401; *Wydermyer,* 51 F.3d at 324. Contrary to Sabbeth's suggestion, however, we did not hold that any challenge during trial would be timely. Rather, we noted that the level of scrutiny given to an indictment falls along a continuum depending on the timing of a defendant's objection. Where, as here, a defendant challenges the sufficiency at the close of the Government's case, we hold that the indictment should still be construed in a liberal manner. As the Eighth Circuit has explained:

> Although [the defendant] did raise [the] issue [of the sufficiency of the indictment] . . . following the close of the government's evidence, we can see no reason to apply a different standard here. Jeopardy still had attached by the time she made her argument, the government and the court already had committed a great deal of resources towards the trial of [the] case, and the defendants do not even maintain the pretense that they were prejudiced in preparing their defenses.

*United States v. Lucas,* 932 F.2d 1210, 1218–19 (8th Cir.1991) (citations and internal quotation marks omitted); *see Goodwin,* 141 F.3d at 401 (citing *Lucas* with approval); *see also United States v. Gooch,* 120 F.3d 78, 80 (7th Cir.1997) (applying this rule); *United States v. Turley,* 891 F.2d 57, 58–59 (3d Cir.1989) (same).

■■ We conclude that the indictment here—when construed liberally—can reasonably be read to allege at least a *de minimis* effect on interstate commerce.

The indictment charged Sabbeth with laundering money by, *inter alia*, fraudulently obtaining funds that SIL owed to two banks, engaging in a series of transfers designed to hide the source and disposition of these funds, and depositing a substantial portion of these funds in a brokerage account at a national financial institution that he had opened using false information. If true, these activities in the aggregate surely would have affected interstate commerce. *See United States v. Leslie,* 103 F.3d 1093, 1100 (2d Cir.1997) ("Money laundering is the archetypal activity which, while in isolation may not affect interstate commerce, undoubtedly will have ramifications in interstate commerce when taken in the aggregate."); *see also id.* at 1102 ("That the drawee bank involved in this case was called a 'Federal' savings institution supports a jury's conclusion that the transaction involved the use of a financial institution which has, at least, a *de minimis* effect on interstate commerce."). Sabbeth cannot persuasively argue, therefore, that his indictment—when construed liberally—failed to indicate that he was being charged with engaging in a transaction that affected interstate commerce, so that he lacked notice of the nature of the charges against him, or so that he could not plead double jeopardy in a future prosecution. *See United States v. Green,* 964 F.2d 365, 375 (5th Cir.1992) (holding that, when liberally construed, allegations in an indictment that banks were involved in a money-laundering scheme sufficiently informed the defendant of an effect on interstate commerce); *cf. Goodwin,* 141 F.3d at 401–02 (holding that an indictment sufficiently alleged a nexus to interstate commerce where it charged the defendant with laundering $4 million in narcotics proceeds through the use of cashier's checks and through the delivery of money to individuals who would arrange remittance to nar-

cotics suppliers). Accordingly, we find no basis to reverse Sabbeth's conviction for money laundering.

### III. CHALLENGES TO SENTENCING

As a final matter, we address Sabbeth's arguments relating to his sentence.

### A. *Application of the Money–Laundering Guidelines*

 In calculating Sabbeth's sentence for the money-laundering count, the District Court (not surprisingly) applied the section of the Sentencing Guidelines for money laundering. *See* U.S.S.G. § 2S1.1. Nonetheless, Sabbeth argues that this was error, and that the District Court should have applied the Guideline section for fraud. *See id.* § 2F1.1.

Appendix A to the 1998 version of the Guidelines—the version applicable at the time of Sabbeth's sentencing—states that in an "atypical case," a court should "use the guideline section most applicable to the nature of the offense conduct charged" in the count of conviction. U.S.S.G.App. A at 425 (1998). Sabbeth argues that his money—laundering offense was "atypical" within the meaning of this provision and that, therefore, his sentence should have been determined by the Guideline provision that best fits his offense-namely, the fraud provision of the Guidelines. To support this argument, Sabbeth relies on *United States v. Smith,* 186 F.3d 290 (3d Cir.1999), where the Third Circuit held that a defendant's money-laundering conviction was "atypical" and therefore directed a district court on remand to apply the fraud guideline. *See id.* at 300.

In *Smith,* the Third Circuit stated that in selecting the appropriate guideline to apply, a court must first determine whether a defendant's case falls outside the "heartland" of cases that typically fall

within the guideline. *See id.* at 297–98. *But cf. Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (describing "heartland" analysis in context of a court's decision to depart downward from the Sentencing Guidelines). It held that if a defendant's case fell outside the "heartland" of cases typically within that guideline, the court should apply a different sentencing guideline—one that is more applicable to the nature of the offense conduct charged. *See Smith,* 186 F.3d at 297–98.

Using this analysis, the Third Circuit concluded in *Smith* that the money-laundering guideline was inappropriate in that case because, even though the defendant had been convicted of money laundering pursuant to his plea of guilty, his money-laundering conduct was an "incidental byproduct" of routine fraud. *Id.* The defendant had left an extensive paper trail, and his action had indicated that there was no genuine effort at concealment. The Third Circuit therefore directed the district court on remand to apply the fraud guidelines pursuant to Appendix A of the Sentencing Guidelines.

We find *Smith* unpersuasive. No other Court of Appeals has held that, in order for a district court to determine the appropriate Guideline provision to apply, it should perform at the threshold a so-called "heartland" analysis, which is typically reserved for downward departures. Indeed, the U.S. Sentencing Commission has recently deleted the language relied on by the Third Circuit and has characterized *Smith* as the result of "confusion." *See* U.S.S.G., Supplement to App. C, Amend.

591 at 30–32 (effective Nov. 1, 2000) (removing the reference to "atypical" cases). Accordingly, we decline to follow *Smith* here.

In any event, even assuming *arguendo* that *Smith* was correctly decided under the pre-amendment Guidelines, the facts of this case are readily distinguishable from those of *Smith.* Sabbeth's money-laundering offense did not fall outside the "heartland" of cases that typically fall within the money-laundering guideline. Unlike in *Smith,* where the money-laundering activity was said to be an "incidental byproduct" of the defendant's fraudulent scheme, Sabbeth's money-laundering activity in this case consisted of a series of financial transactions completely separate from the bankruptcy fraud. Sabbeth shuffled his fraud proceeds through at least two bogus accounts with two false social security numbers. Moreover, he structured many of his withdrawals in cash amounts of less than $10,000 in order to avoid currency-reporting requirements. Sabbeth's conduct was therefore not in any way "atypical," and the District Court properly sentenced Sabbeth under the money-laundering guideline.

## B. *No "Grouping" of the Money Laundering and Fraud Convictions*

 As a final argument, Sabbeth contends that the District Court should have "grouped" his money-laundering and fraud offenses under Section 3D1.2(b) of the Sentencing Guidelines.[11]

Section 3D1.1 of the Guidelines establishes a three-step procedure for determining the combined offense level in a case

---

11. Section 3D1.2 provides in relevant part:
 All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
 (a) . . . .

 (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

involving multiple counts of conviction. First, all counts of conviction are separated into distinct "groups" of "closely related" counts according to the rules set forth in Section 3D1.2. Second, each group is assigned an offense level based on the count with the highest offense level in the group according to the rules specified in Section 3D1.3. Third, if there is more than one group, the combined offense level is determined under Section 3D1.4 by taking the offense level applicable to the group with the highest offense level and increasing that offense level according to "units" assigned to each group.

In the case at hand, the District Court declined to group Sabbeth's money-laundering and bankruptcy-fraud counts under Section 3D1.2 of the Sentencing Guidelines. As a result of this decision, Sabbeth's sentencing range was 97 to 121 months instead of 87 to 108 months.[12]

Sabbeth argues that the District Court should have "grouped" the money-laundering count with the bankruptcy-fraud count pursuant to Section 3D1.2(b) of the Guidelines because his money laundering was "highly interwoven into [the] fraud scheme." To support this argument, he relies primarily on *United States v. Napoli*, 179 F.3d 1 (2d Cir.1999), *cert. denied*, 528 U.S. 1162, 120 S.Ct. 1176, 145 L.Ed.2d 1084 (2000), where we left open the possibility of grouping fraud and money laundering if they are "so highly interwoven ... that the victim" of each is the same. *See id.* at 8 n. 3.

Sabbeth's reliance on *Napoli* is misplaced. In *Napoli*, we held that, in general, fraud and money laundering should *not* be grouped together under Section 3D1.2(b). *See id.* at 7–8. Section 3D1.2(b) permits different counts to be grouped together only where they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2(b). We reasoned that fraud and money laundering generally involve different harms to different victims. *See Napoli*, 179 F.3d at 7–8. As we explained, the victims of fraud are those who are defrauded; on the other hand, the victim of money laundering is "ordinarily society at large." *Id.* at 7. "Society is harmed when, for example, the ill-gotten gains from a criminal enterprise are allowed to be used for profit, the sources of these funds are concealed from police investigation or criminals are allowed to disperse capital from lawfully operating economic institutions to other criminals in and out of the country." *Id.* at 7–8 (internal quotation marks and alterations omitted).

As in most cases involving these two offenses, Sabbeth's fraud and money-laundering conduct involved different harms to different victims. Sabbeth caused injury to the Banks by fraudulently conveying assets of SIL, and he caused injury to society at large by laundering these assets to deter others from discovering his criminal activity. The District Court therefore properly refused to group these two offenses under Section 3D1.2(b) of the Guidelines for purposes of sentencing.

**12.** Sabbeth's Criminal History Category was I; his offense level for the money-laundering was 28; and his offense level for the bankruptcy-fraud count was 24. Because the money-laundering and fraud counts were not grouped, the District Court took the offense level of 28 applicable to the money-laundering count—the group with the highest offense level—and added to it 2 levels for the bankruptcy-fraud group pursuant to Section 3D1.4(a). *See* U.S.S.G. § 3D1.4. The result was that Sabbeth's total offense level was increased from 28 to 30, which, in light of his Criminal History Category of I, increased his sentencing range from 87–108 months to 97–121 months. *See* U.S.S.G. tbl.

## IV. CONCLUSION

In sum, we hold that

(1) the District Court's definition of "property of . . . [a] corporation" under Section 152(7) did not constructively amend Sabbeth's indictment and is not a basis for reversal;

(2) the District Court properly defined "fraudulently" for purposes of the false-oath counts;

(3) the indictment, when construed in an appropriately liberal manner, sufficiently alleged that Sabbeth had engaged in money-laundering conduct that affected interstate commerce;

(4) the District Court did not err in sentencing Sabbeth under the money-laundering provision of the Guidelines rather than the fraud provision of the Guidelines; and

(5) the District Court did not err in declining to "group" Sabbeth's bankruptcy-fraud and money-laundering offenses under Section 3D1.2(b) of the Sentencing Guidelines.

Accordingly, the judgment of the District Court is affirmed.