Roy William **HARRIS**, Petitioner,

v.

**UNITED STATES of America,** Respondent.

No. 97 CIV.1904(CSH).

United States District Court, S.D. New York.

April 4, 2003.

John Conway, Greenwich, CT, for Petitioner.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Petitioner Roy William Harris has moved pursuant to Rule 60(b)(6), Fed. R.Civ.P., for relief from the Opinion and Order of this Court dated May 20, 1998, which dismissed Harris's petition for a writ of habeas corpus under 28 U.S.C. § 2255. *Harris v. United States*, 9 F.Supp.2d 246 (S.D.N.Y.1998), *aff'd.*, 216 F.3d 1072, 2000 WL 730375 (2d Cir.2000) (table).[1] Harris seeks by his present motion to reduce the length of his sentence, on the ground that this Court's Sentencing Guideline calculations were incorrect. The present circumstances of the case are described in this Court's opinion dated October 30, 2002 and reported at 2002 WL 31427358 (the "October Opinion"), familiarity with which is presumed.

In the October Opinion I ruled that Harris's Rule 60(b) motion was not procedurally barred, and declared my intention to consider its merits. The government moved for reconsideration of that ruling. I decided to combine the government's renewed assertions of procedural bar with a consideration of the merits of Harris's challenge to the Court's sentencing calculations. Further briefs were exchanged. Counsel for the parties argued both aspects of the case on February 5, 2003.

For the reasons I stated at that hearing, Tr. 2–5, and do not here reiterate, I will state my views on the merits of Harris' motion even if I conclude that it is procedurally barred. I consider these two questions in turn.

## I. PROCEDURAL BAR

In its initial opposition to Harris's motion, the government contended that four procedural bars precluded Harris from challenging the Court's Sentencing Guidelines calculations and consequently the length of his sentence: (1) failure to raise these sentencing issues at the sentencing hearing; (2) failure to raise those issues on direct appeal; (3) the impropriety of using a Rule 60(b) motion to circumvent the statutory restrictions on second or successive § 2255 habeas petitions; and (4) the asserted untimeliness of the Rule 60(b) motion. At oral argument on February 5, 2003 the government abandoned the first asserted bar, the sentencing minutes having revealed that counsel then representing Harris had raised the points at issue. Government counsel laid initial stress upon the third procedural bar, and I consider that question first in this Opinion.

### A. The Efficacy of Harris' Rule 60(b) Motion

The government contended that Harris' utilization of Rule 60(b) as a vehicle for

---

**1.** I began that opinion by saying: "Roy William Harris petitions this Court pursuant to 28 U.S.C. § 2255 for a writ of habeas corpus setting aside his prior conviction, and under Rule 33, Fed.R.Cr.P., for a new trial." 9 F.Supp.2d at 249. The Second Circuit, in its summary order affirming this Court's denial of relief, seemingly accepted those characterizations. 216 F.3d 1072, 2000 WL 730375, at *1. ("The district court denied the petition and the motion."). In other decisions the Second Circuit seems to suggest that an application for relief under § 2255 is procedurally something other than the traditional writ of habeas corpus found in 28 U.S.C. § 2241. *See Triestman v. United States*, 124 F.3d 361,

373 (2d Cir.1997) ("Significantly, § 2255 as originally enacted, and as amended by the AEDPA, contains an explicit exception to the rule that a federal prisoner must use § 2255 instead of seeking a writ of habeas corpus under § 2241," thereby permitting the defendant to argue that "the AEDPA has rendered § 2255 inadequate and ineffective to test the legality of his detention, and therefore, by the express terms of § 2255, he remains free to seek a writ of habeas corpus."). Because throughout the case this Court in its opinions and counsel in their briefs have referred to Harris' invocation of § 2255 as a petition for habeas corpus, I will continue to do so in this opinion.

relief is "twice damned: first, as an impermissible effort to circumvent the one-year statute of limitations on bringing claims under § 2255; and second, as an equally impermissible effort to circumvent the statutory restrictions on second or successive § 2255 petitions." October Opinion at 2002 WL 31427358 *8. I rejected the first contention summarily, reasoning that the government had failed to "show that, as a matter of law, I am required to peel off Mr. Lynam's [counsel for Harris] Rule 60(b) label and affix a § 2255 label." *Id.* The "question of substance" was "whether Harris was impermissibly invoking Rule 60(b) to circumvent the statutory restrictions on second or successive habeas corpus applications found in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(b), incorporated by reference in the last paragraph of § 2255." *Id.* at *9 (footnote omitted). That question is also dispositive, since it is common ground that if the procedural vehicle of a Rule 60(b) motion is not available to Harris, he cannot surmount the restrictions imposed by the AEDPA. *See* the October 30 Opinion, 2002 WL 31427358, at *9 n. 5.

In answering that question in the negative, I relied upon *Rodriguez v. Mitchell,* 252 F.3d 191 (2d Cir.2001), where the Second Circuit said:

> We now rule that a motion under Rule 60(b) to vacate a judgment denying habeas is not a second or successive habeas petition and should therefore be treated as any other motion under Rule 60(b).

252 F.2d 191, 198. That language is seemingly very broad; but the court said later in *Rodriguez::*

> We note that the ground petitioner asserts in support of his motion—his claim that Mort, his state trial attorney, made fraudulent representations to the federal

district court and that the respondent fraudulently concealed that respondent had deposed Mort—relates to the integrity of the federal habeas proceeding, not to the integrity of the state criminal trial. These grounds, if proven, would simply result in the reopening of the federal habeas proceeding—not in the vacating of the state criminal judgment.

252 F.3d at 199.

In its first brief the government relied upon that language to argue that *Rodriguez* is "better read" as holding that Rule 60(b) motions will not be treated as second or successive petitions when they go to the integrity of the initial habeas proceedings, which the government contended Harris's Rule 60(b) motion did not do. *See* October Opinion at *11. In the October Opinion I rejected that argument for two reasons:

> First, the government reads *Rodriguez* too narrowly, given the broad language with which the Second Circuit expressed its reasoning, a rationale that would on its face apply to all Rule 60(b) motions to vacate habeas denials, whether or not the motion attacked the integrity of the initial habeas proceeding. Second, even on the government's narrow reading of *Rodriguez,* Harris is in fact attacking the integrity of the initial habeas proceedings submitted by Mr. Conway [counsel for Harris at the time]. Specifically, Harris contends that Mr. Conway rendered ineffective assistance of counsel by failing to include in the habeas petition the sentencing claims which Mr. Lewis's [counsel for Harris at the time] ineffective assistance caused to be omitted from the direct appeal.

*Id.* The government's motion for reconsideration on the procedural bar aspect of the case challenges both reasons and demonstrates the necessity for further analysis.

First, as to the breadth of *Rodriguez's* language: in a subsequent decision, *Kel-*

*logg v. Strack*, 269 F.3d 100, 102 n. 2 (2d Cir.2001), the Second Circuit appeared to speak in equally broad tongues. ("This Court has recently settled the question of whether a Rule 60(b) motion for relief from the denial of a § 2254 petition should be treated as a second or successive habeas petition. *See Rodriguez v. Mitchell*, 252 F.3d 191, 198–200 (2d Cir.2001) (holding that such a motion should not be treated as a second or successive petition.")). But it would now appear that *Rodriguez* had *not* settled the question. In the more recent case of *Gitten v. United States*, 311 F.3d 529, 532 n. 4 (2d Cir.2002), decided after the October Opinion in the case at bar, the Second Circuit said:

> In suggesting that *Rodriguez* "settled" the issue by ruling that a 60(b) motion should never be treated as a second or successive motion, *Kellogg v. Strack*, 269 F.3d 100, 102–03 n. 2 (2d Cir.2001), somewhat overstated the matter. *Rodriguez* concerned a 60(b) motion with grounds that "relate[d] to the integrity of the federal habeas proceeding, not to the integrity of the [underlying conviction]." 252 F.3d at 199.

The government's reconsideration motion requires me to consider what *Gitten* says about what *Kellogg* said about *Rodriguez*, in order to determine whether I can still regard the statement in *Rodriguez* that "a motion under Rule 60(b) to vacate a judgment denying habeas is not a second or successive habeas petition" as applying to all such Rule 60(b) motions, whatever the grounds asserted for them, as Harris contends, or only to Rule 60(b) motions with grounds relating to the integrity of the habeas proceeding, as the government contends.

If the government is correct in that contention, one must evaluate the second prong of my reasoning in the October Opinion, namely, that Harris' Rule 60(b) motion "attack[ed] the integrity of the initial habeas proceedings submitted by Mr. Conway" by contending that Mr. Conway rendered ineffective assistance of counsel in those proceedings. The government contends that conclusion is untenable in light of the Supreme Court's decision in *Coleman v. Thompson*, 501 U.S. 722, 752–53, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), where the Court said:

> There is no constitutional right to an attorney in state post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987); *Murray v. Giarratano*, 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (applying the rule to capital cases). Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings. *See Wainwright v. Torna*, 455 U.S. 586, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982) (where there is no constitutional right to counsel there can be no deprivation of effective assistance). Coleman contends that it was his attorney's error that led to the late filing of his state habeas appeal. *This error cannot be constitutionally ineffective;* therefore Coleman must "bear the risk of attorney error that results in a procedural default."

(emphasis added).[2]

Two months before its decision in *Coleman*, the Supreme Court decided *McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). *McCleskey* undertook to clarify the abuse-of-the-writ doctrine, "a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions," *id.* at 489,

---

2. AUSA Failla, who argued the case for the government, was kind enough to say that the *Coleman* case "was not really dealt with by the government in its initial papers." Tr. 17.

111 S.Ct. 1454, whose purpose was to "define[ ] the circumstances in which federal courts decline to entertain a claim presented for the first time in a second or subsequent petition for a writ of habeas corpus." *Id.* at 470, 111 S.Ct. 1454.[3] The Court held in *McCleskey* that under the abuse-of-the-writ doctrine, a state defendant's failure to raise a claim under *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964),[4] in his first federal habeas petition barred his assertion of that claim in his second federal petition. Applying standards derived from other contexts, *McCleskey* held that a federal habeas petitioner could avoid this bar of procedural default only if he could show cause and prejudice: "cause" meaning "some objective factor external to the defense impeded counsel's efforts to raise the claim" in the first proceeding, and "prejudice" meaning "actual prejudice resulting from the errors of which he complains." *Id.* at 493–94 (citations and internal quotation marks omitted). The Court was careful to observe in *McCleskey* that "[a]pplication of the cause and prejudice standard in the abuse-of-the-writ context" does not "imply that there is a constitutional right to counsel in federal habeas corpus," citing and quoting *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987) ("[T]he right to appointed counsel extends to the first appeal of right, and no further"). *Id.* at 494, 111 S.Ct. 1454.

That language could certainly be read as a holding that there *is* no constitutional right to the assistance of counsel in a habeas proceeding; indeed, the Second Circuit read it that way in *Bloomer v. United States,* 162 F.3d 187, 191 n. 1 (2d Cir.1998) ("However, a petitioner has no right to the effective assistance of counsel when he collaterally attacks his conviction. (citing *McCleskey* ). Thus, ineffective assistance of counsel does not constitute cause sufficient to excuse an abuse of the writ.").[5] Any lingering doubt on that score was resolved by *Coleman,* with its crystal clear declaration that "[t]here is no constitutional right to an attorney in state post-conviction proceedings." That there is no principled difference in that regard between state post-conviction proceedings and federal habeas proceedings is demonstrated by the Second Circuit's decision in *Bloomer,* which involved a federal habeas petition under § 2255.

Seeking to preserve the benefits of the October Opinion, counsel for Harris perseveres in his contention that "it is too narrow a reading of *Rodriguez* to interpret it as being limited to the so-called integrity of the proceedings issues," Tr. 35, and that in any event "we do have an integrity of the [habeas] proceedings issue with regard to what happened in this proceeding because of Mr. Conway's presentation." Tr. 36. As for the Second Circuit's decision in the *Gitten* case, counsel submits that

> the real reading of *Gitten* is not to treat Rule 60(b) motions as second or successive habeas petition readings. That is what *Gitten* was telling the district

---

**3.** The restrictions imposed upon second or successive or successive habeas petitions by the abuse-of-the-writ doctrine antedated the AEDPA, which was passed in 1996 and replaced the doctrine. As noted in text, the AEDPA governs the case at bar.

**4.** *Massiah* held that the elicitation of statements from a defendant in a situation created by the state to induce him to make incrimina-

ting statements without the presence of counsel amounted to an unconstitutional deprivation of the right to the assistance of counsel.

**5.** In *Bloomer* the Second Circuit applied pre-AEDPA abuse-of-the-writ standards because petitioner "filed his § 2255 motion prior to the effective date of the AEDPA." 162 F.3d at 191.

courts, that they should not consider these 60(b) motions as second habeases, which is obviously what I think the government is trying to do to me in this case.

Tr. 36. As for the Supreme Court's decision in *Coleman,* counsel contends that "the case is not a case discussing Rule 60(b), and I think that is an important distinction because it came up in a totally different context." Tr. 37.[6] The fact that there is no constitutional right to counsel in a habeas proceeding, the argument for Harris concludes, is of no moment, because "there is no constitutional right to counsel in any civil case, and habeas is essentially a civil case," Tr. 38; and there is Second Circuit authority for the proposition that the failures of counsel in a civil case may justify relief under Rule 60(b)(6). *See United States v. Cirami,* 563 F.2d 26 (2d Cir.1977) (a civil action brought by the government to recover unpaid taxes).

It seems to me that re-examination of these questions must begin with an effort to divine what effect, if any, the Second Circuit's opinion in *Gitten* has upon the broad language in *Rodriguez,* upon which I relied in the October Opinion and Harris continues to rely. That task is complicated, for this reader at least, by somewhat delphic aspects of the *Gitten* opinion. To paraphrase a public figure of yesteryear, perhaps a useful approach is to watch what the Second Circuit did in *Gitten,* not just what it said.

In order fully to comprehend what the court of appeals did in *Gitten,* it is necessary first to understand what the district court did. Defendant Maurice Karl Gitten was convicted for illegal entry following deportation in violation of 8 U.S.C. §§ 1326(a) and (b)(2). District Judge Cote

sentenced Gitten principally to 77 months in prison, taking the view that Gitten's prior convictions for robbery and attempted burglary were "aggravated felonies" as defined in 8 U.S.C. § 1101(a)(43), a conclusion that enhanced Gitten's sentence. On direct appeal Gitten, represented by counsel, argued for the first time that the district court committed plain error in sentencing him under the 1998 version of the Sentencing Guidelines rather than the 1995 version. The Second Circuit affirmed the sentence. 231 F.3d 77 (2d Cir.2000).

Gitten then filed in the district court a *pro se* petition for habeas corpus under 28 U.S.C. § 2255. *United States v. Gitten,* No. 00 Civ. 9100, 2001 WL 363052 (S.D.N.Y. Apr. 10, 2001). He argued (1) that his convictions prior to 1999 should not have been considered aggravated felonies for sentencing purposes; (2) his appellate counsel was ineffective for refusing to raise this argument on the direct appeal from his conviction; and (3) his conviction should be vacated because he reentered the United States more than five years before he was "found" in the United States and arrested, as that term is used in the governing statute. *Id.* at *1. Judge Cote rejected these arguments and dismissed Gitten's habeas petition. She denied a certificate of appealability. So did the court of appeals.

Gitten then moved pursuant to Rule 60(b)(40 and 6) to vacate the district court's denial of his § 2255 habeas petition. *Gitten v. United States,* No. 00 Civ. 9100, 2002 WL 662883 (S.D.N.Y. Apr. 23, 2002). He argued that the decision denying his petition must be vacated "because certain arguments regarding the validity of his underlying conviction were not pre-

---

6. Counsel meant that *Coleman* arose out of a federal habeas petition, not a Rule 60(b) motion.

sented to the habeas court," an argument that in Judge Cote's view "implicates the integrity of his habeas proceedings." *Id.* at *2. Gitten also "raised claims that implicate only the validity of his underlying conviction," *id.* at *3. In charting the proper course to follow, Judge Cote looked to the Second Circuit's decision in *Rodriguez* for guidance. She noted the *Rodriguez* court's observation the "the ground urged for the petitioner related to the 'integrity of the federal habeas proceeding, not to the integrity of the state criminal trial,'" citing to 252 F.3d at 199, and went on to say:

> In *Rodriguez*, the petitioner's Rule 60(b) motion asserted that fraudulent representations had been made to the habeas court and had deprived the petitioner of evidence necessary to corroborate his contentions during a hearing on his petition. In such circumstances, the Rule 60(b) motion directly implicated the "integrity of the federal habeas proceeding." It appears then, that the first task of a court receiving a Rule 60(b) motion attacking a judgment rendered on the merits of a habeas petition is to determine whether the motion is addressed to the integrity of the federal habeas proceedings, or is instead a vehicle for filing a second or successive petition.

*Id.* at *2 (page citations omitted). Judge Cote carried out the task she had set for herself by denying Gitten's Rule 60(b) motion insofar as it was based on the ground that certain arguments were not presented to the habeas court (the "integrity" issue), and transferred the balance of the case to the court of appeals for consideration of certification pursuant to the AEDPA, 28 U.S.C. § 2244.

Apparently that attempted transfer went astray. *See Gitten*, 311 F.3d at 531 ("However, a search of this Court's records discloses no documents reflecting a transfer pursuant to the First 60(b) Ruling."). Gitten then filed a second Rule 60(b) motion to vacate the district court's denial of his habeas petition, amending with Judge Cote's permission the asserted grounds for relief. *Gitten v. United States*, No. 00 Civ. 9100, 2002 WL 1891338 (S.D.N.Y. Aug. 15, 2002). Steering the course she had previously laid out, Judge Cote denied Gitten's Rule 60(b) motion insofar as his argument "challenges the integrity of his federal habeas proceedings," *id.* at *1, and again transferred the balance of the case to the court of appeals for § 2244 certification consideration. This time the transfer went through, and so the stage was set for the Second Circuit's *Gitten* opinion.

Judge Newman began that opinion by saying that Gitten's application to the court of appeals for leave to file a second collateral attack on a criminal conviction "requires consideration of the procedures to be followed by district courts when a motion for relief under Rule 60(b) of the Federal Rules of Civil Procedure, challenging a denial of a collateral attack, also includes one or more claims that appear to constitute a second collateral attack on the same conviction." 311 F.3d at 530. The court of appeals concluded in *Gitten* that "a district court has some flexibility in handling such situations, but must be careful not to precipitously treat a Rule 60(b) motion as a second collateral attack requiring referral to this Court to discharge its 'gate-keeping' function under 28 U.S.C. § 2244 concerning successive applications for habeas corpus," and remanded the case to the district court for further consideration. *Id.*

Harris finds comfort in this language, but for purposes of the present analysis it is at least as important to pay attention to what *Gitten* said about *Rodriguez*. During the course of its review of pertinent

cases, this is how the *Gitten* court described the holding in *Rodriguez*: "*Rodriguez* held that a Rule 60(b) motion challenging the 'integrity' of a collateral attack proceeding should not be treated as a second collateral attack on a conviction, even though the motion ultimately seeks to overturn the conviction." 311 F.3d at 531. And again:

> Several courts have ruled that a Rule 60(b) motion challenging the denial of a collateral attack should be treated as an application for a second or successive collateral attack and sent to a court of appeals for its gate-keeping decision. *Rodriguez* ruled, however, that a Rule 60(b) motion that challenges the validity of the denial of a collateral attack on a conviction is not a second or successive collateral attack (requiring permission from the court of appeals to file), even though the ultimate relief that the movant seeks is to have his conviction vacated.

*Id.* at 532 (citation omitted).[7]

The court of appeals remanded *Gitten* to the district court for further consideration in order to avoid the laying of a procedural trap for the unwary, a salutary purpose prompted by Judge Newman's acknowledgment that "[u]nderstanding the new AEDPA procedures is difficult enough for judges and lawyers, and *pro se* prisoners cannot be expected to have all the complexities of these procedures in mind." 311 F.3d at 533. The particular hazard for such litigants that the Second Circuit identified in *Gitten* arises from the reality that any portion of a Rule 60(b) motion a district court characterizes as a second or successive collateral attack "will be tested against the strict gate-keeping standards" of the AEDPA, so that "premature treat-

ment of the converted portion of the 60(b) motion as a second collateral attack risks subjecting the prisoner not only to summary denial of that challenge but also to summary denial of any subsequent (*i.e.*, third) challenge as an abuse of the writ." *Id.* The Second Circuit's opinion in *Gitten* concludes with this delineation of "the appropriate resolution of the problem posed by a 60(b) motion that includes new collateral attacks on a conviction":

> The district courts must be careful not to recharacterize a portion of the 60(b) motion as a second or successive collateral attack and transfer it to this Court until the prisoner has been informed of the district court's intent to transfer and afforded a sufficient opportunity to avoid the transfer by withdrawing (perhaps for later refiling explicitly as a new collateral attack) the portion of his 60(b) motion that the district court believes presents new challenges to the underlying conviction. Of course, after a district court has denied as meritless the portion of the 60(b) motion *that the court considers to come within the scope of Rule 60(b)*, the court always has the alternative of simply denying, as beyond the scope of Rule 60(b), the balance of the motion, *i.e., the portion believed to present new attacks on the conviction.*

*Id.* at 534 (emphasis added). Applying these humane principles, the court of appeals remanded the case to the district court "to afford that Court an opportunity either to alert Gitten to his option to avoid transfer, or to deny the Rule 60(b) motion in its entirety." *Id.*

Examining *Rodriguez* through the prism of the Second Circuit's post-October Opinion decision in *Gitten* reveals that *Rodri-*

---

7. *Gitten* described the holding in *Rodriguez* in those terms for a third time in its footnote criticizing *Kellogg v. Strack* as having "over-

stated the matter." 311 F.3d at 532 n. 4 (quoted in text *supra*).

*guez* cannot sustain the broad reading I gave it in that Opinion and to which Harris still clings. The last-quoted language from *Gitten* demonstrates the Second Circuit's view that the permissible "scope" of a Rule 60(b) motion brought by a prisoner after denial of his habeas petition is limited to grounds for relief that cannot be characterized as "new attacks upon the conviction" (or, in the case at bar, upon the sentence). That view is consistent with the *Gitten* court's statement that *Rodriguez* held "a Rule 60(b) motion that *challenges the validity of the denial of a collateral attack* on a conviction is not a second or successive collateral attack," 311 F.3d at 532 (emphasis added). That interpretation of *Rodriguez*, thrice repeated in *Gitten* (twice in text and once in a footnote), must be taken as an authoritative expression by the Second Circuit of what it held in *Rodriguez*.[8]

Accordingly I must abandon the broader interpretation of *Rodriguez* expressed in the October Opinion. The decisive question then becomes whether Harris' Rule 60(b) motion is in fact an attack upon the validity of his prior unsuccessful habeas proceeding; or whether, in Judge Cote's apt phrase, his Rule 60(b) motion "is instead a vehicle for filing a second or successive petition." *Gitten*, 2002 WL 662883, at *2.

On one level, it is perfectly apparent that Harris' Rule 60(b) motion is a "vehicle" for a second effort to obtain the same relief. As noted in the Procedural Background section of the October Opinion, 2002 WL 31427358 at *1–*6, the sentencing guidelines arguments Harris makes in his present Rule 60(b) motion are the same he asserted in a prior § 2241 habeas petition in the District of New Jersey. The District of New Jersey treated that petition as falling under § 2255, not § 2241;

and, aware of Harris's first § 2255 habeas petition filed in this Court by Mr. Conway, the District of New Jersey transferred the case to the Second Circuit for that court's determination of whether Harris should be given permission under the AEDPA to file a second § 2255 petition. The court of appeals refused permission. Harris then filed this Rule 60(b) motion, making the same sentencing guidelines arguments and seeking the same relief, namely, a reduction in his sentence.

At first blush, it would certainly seem that Harris is using this Rule 60(b) motion as "a vehicle for filing a second or successive petition." However, as noted *supra*, I dealt with that aspect of the case in the October Opinion by concluding that even on a narrow reading of *Rodriguez*, "Harris is in fact attacking the integrity of the initial habeas proceedings submitted by Mr. Conway. Specifically, Harris contends that Mr. Conway rendered ineffective assistance of counsel by failing to include in the habeas petition the sentencing claims which Mr. Lewis's ineffective assistance caused to be omitted from the direct appeal." 2002 WL 31427358, at *11.

It is the validity of that conclusion that the government challenges under the Supreme Court decisions in *Coleman* and *McCleskey*, and Second Circuit decisions such as *Bloomer*. The government argues that since there is no constitutional right to the assistance of counsel in a habeas proceeding, it follows as the night the day that in habeas cases where a prisoner is represented, the ineffective assistance of that counsel cannot be said to affect the integrity, constitutional or otherwise, of the habeas proceedings. The Second Circuit seems to have adopted precisely that reasoning in *Bloomer*; having said that "a petitioner has no right to the effective

---

**8.** "What I tell you three times is true." Lewis Carroll, *Hunting of the Snark.*

assistance of counsel when he collaterally attacks his conviction,"[9] the court of appeals then took the second step to the conclusion for which the government contends in the case at bar: *"Thus,* ineffective assistance of counsel does not constitute cause sufficient to excuse an abuse of the writ." 162 F.3d at 191 n. 1 (emphasis added).

Harris responds by pointing out, accurately, that there is no constitutional right to counsel in any civil case, and that a habeas proceeding is "essentially" a civil case; moreover, the failings of counsel in a civil case can justify relief under Rule 60(b), as the *Cirami* case shows. However, it now appears to me, upon reconsideration, that there is a flaw in this reasoning. To be sure, a habeas proceeding bears certain trappings of a civil action; the governing statutes are found in Title 28 of the United States Code, where civil remedies and rules of procedure dwell, and the Clerk gives a habeas petition a civil docket number when it is filed. But there is one aspect of a habeas petition that is shared by no other "civil" action: it must conform to the requirements and restrictions of the AEDPA. In that regard, *Cirami* does not assist Harris; it was a tax case, not a habeas petition.

■ I conclude that this distinction makes a difference. The case at bar is not a garden-variety piece of civil litigation, upon which the AEDPA imposes no re-

strictions. It is instead an effort by a federal prisoner to mount a second attack upon his conviction and sentence in the district court which had rejected his earlier § 2255 petition. I am constrained to regard Harris's present motion as a "second or successive motion" under § 2255, requiring certification by the court of appeals, which the Second Circuit has already declined to grant.

■ Moreover, I cannot accept Rule 60(b) as a panacea, because the Supreme Court and Second Circuit cases cited and quoted *supra* foreclose me from holding that ineffectiveness of assistance on the part of Mr. Conway, Harris' counsel on the habeas proceeding, directly implicated the integrity of the habeas proceeding, the only proper scope of a Rule 60(b) motion under the Second Circuit's holding in *Gitten.* Since there is no constitutional right to counsel in habeas proceedings, the errors of counsel who appear in them "cannot be constitutionally ineffective," *Coleman,* 501 U.S. at 753, 111 S.Ct. 2546, and "do[ ] not constitute cause sufficient to excuse an abuse of the writ," *Bloomer,* 162 F.3d at 191 n. 1.

Therefore I have no option but to grant the government's motion for reconsideration and hold that Harris's Rule 60(b) motion is procedurally barred as an impermissible effort to avoid the restrictions of § 2255.[10]

---

9.  Harris is attacking his sentence, not his conviction, but for purposes of this analysis this is a distinction without a difference.

10.  Before concluding that Harris's Rule 60(b) motion must be regarded as a "second or successive motion" under § 2255, I considered *mea sponte* the Second Circuit's decision in *Vasquez v. Parrott,* 318 F.3d 387 (2d Cir. 2003). *Vasquez* turned upon whether a state prisoner's second habeas petition under § 2254 was properly construed as a "second or successive habeas corpus application" un-

der § 2254 within the meaning of § 2244, as amended by the AEDPA. The prisoner's first § 2254 petition contended that a state appellate court's delay in deciding the appeal from his conviction denied him due process. That appellate court then confirmed the conviction. The prisoner's second § 2254 petition asserted, as had the direct appeal, that he received ineffective assistance of counsel at the trial and he was represented by a conflicted attorney. The Second Circuit held that the earlier petition did not count for § 2244 purposes, reasoning that "two petitions are not

## B. Other Procedural Bars

On its motion for reconsideration, the government asserts two other bars to Harris's Rule 60(b) motion: (1) the motion is governed by the one-year statute of limitations in Rule 60(b)(1) (providing relief from a judgment for "excusable neglect"), rather than the "reasonable time" limitation of Rule 60(b)(6) ("any other reason justifying relief from the operation of the judgment"); and (2) the assistance to Harris given by David Lewis, his attorney on the direct appeal, cannot be characterized as constitutionally ineffective. The allegedly ineffective assistance of Mr. Lewis on the direct appeal is, of course, a vital link in the chain Harris must forge to obtain relief from his sentence. *See Harris*, 2002 WL 31427358, at *11 ("Harris contends that Mr. Conway rendered ineffective assistance of counsel by failing to include in the habeas petition the sentencing claims which Mr. Lewis's ineffective assistance caused to be omitted from the direct appeal.").

There is no substance to the first of these contentions. Constitutionally ineffective assistance of counsel does not fit comfortably within the Rule 60(b)(1) concept of "excusable neglect." *Cirami*, 563 F.2d 26, does not solve all of Harris's problems, but it solves this one; as that case holds, the conduct of counsel may

'successive' under § 2244 merely because they are both brought by the same prisoner. Rather, to be considered 'successive,' a prisoner's second petition must, in a broad sense, represent a second attack by federal habeas petition on the same conviction." 318 F.3d at 390. The prisoner's first petition did not count because "[w]hile his first petition certainly *concerned* his 1996 robbery conviction, it did not *attack* that conviction." *Id.* (emphasis in original).

*Vasquez* is worth considering in the case at bar because in an extended footnote at 318 F.3d 392 n. 1, the Second Circuit examined "what Petitioner's status would be if his imprisonment were under a federal, rather than a state, judgment," that being the situation with Harris. The Second Circuit observed that § 2255 "applies only to motions to be released 'upon the ground that the *sentence was imposed* in violation of the Constitution or laws of the United States' (or other grounds similarly attacking the legality of the imposition of the sentence)" (emphasis in original), and added: "For a petition to qualify as a second or successive petition under § 2255, it must therefore be at least the second petition attacking the same judgment of conviction on the ground that his sentence was not legally imposed. Because Petitioner's first petition did not contend that his sentence was illegally imposed, his first petition, regardless how he designated it, would not have been a first petition under § 2255."

Since Harris's first petition, brought by Mr. Conway, did not directly attack the length of his sentence, the question arises whether, under the reasoning of footnote 1 in *Vasquez*, it should have been regarded as a habeas petition under § 2241(c)(1) ("in custody under or by color of the authority of the United States") or (3) ("in custody in violation of the Constitution or laws or treaties of the United States."). If that would have been the correct designation, Harris's petition brought by present counsel, which the District of New Jersey regarded as falling under § 2255, would not be a "second or successive" petition under § 2255. *Cf. United States v. Triestman*, 178 F.3d 624 (2d Cir.1999) (treating a § 2241 petition, following a § 2255 petition, as not subject to the AEDPA's second-petition rule). But I do not think that line of reasoning assists Harris, for two reasons. First, broadly speaking, both of his petitions attacked the legality of the imposition of the same sentence, albeit on different grounds. Second, the court of appeals clearly regarded Harris's two petitions as falling under § 2255 when it denied a § 2244 certification. That would appear to constitute the law of the case. As *Vasquez* indicates, the court of appeals examines the need for a § 2244 certificate *sua sponte;* the state prisoner in that case made a motion in that court for a § 2244 certificate, and the court of appeals held that in the circumstances, "Petitioner does not require leave of this Court to file his new § 2254 petition with the district court." 318 F.3d at 389.

support relief from a judgment under Rule 60(b)(6).

As for the government's second contention, I will defer further discussion of Mr. Lewis's appellate representation of Harris until I have considered the merits of present counsel's sentencing arguments in Part II, *infra*. In doing so I follow the lead of Judge Cote in the *Gitten* litigation, where the habeas petitioner claimed *inter alia* that appellate counsel was ineffective for failing to raise certain arguments on the direct appeal from the conviction. Addressing that claim, Judge Cote said:

> This does not constitute ineffective assistance of counsel since the attorney was entitled to raise the stronger arguments and to omit those with less merit. *Moreover*, as the discussion above reflects, there was no error or prejudice at either the trial court level or the appellate court level in failing to raise these issues *since they are without merit.*

2001 WL 363052, at *3 (emphasis added).

## II. THE MERITS

For purposes of the discussion in Part II I will assume, contrary to the conclusion reached in Part I, that Harris is not procedurally barred from challenging this Court's calculations under the United States Sentencing Guidelines ("U.S.S.G." or "the Sentencing Guidelines") that determined the length of his sentence. I turn to the merits of that challenge.

Harris makes two arguments with respect to the Court's calculations. First, he contends that the money laundering charge in the indictment should have been grouped with the fraud charges pursuant to U.S.S.G. § 3D1.2. Second, he contends that the Court's action in imposing both a two-level severity of offense increase under U.S.S.G. § 2F1.1(b)(2)(A) for "more than minimal planning," and a four-level increase under § 3B1.1(a) for being "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," constituted impermissible double counting. Both contentions were advanced at the sentencing hearing by Harris's then counsel and I rejected both. Had I accepted them, the Guidelines sentencing range would have been 121–151 months, rather than the 188–235 month range which I calculated in sentencing Harris to a term of 188 months. Present counsel for Harris reassert these Guidelines contentions, and I will reconsider them, assisted by the briefs the parties have submitted on this motion and the oral arguments at the February 5, 2003 hearing.

Preliminarily, it may be observed that the prime numbers in Sentencing Guidelines mathematics are those for Criminal History Category and Offense Level, which intersect in the Sentencing Table to produce a sentencing range expressed in months of imprisonment. Since Harris had no prior criminal record, his Criminal History Category was I, the most favorable number. The sentencing issues in the case relate to the proper calculation of the Offense Level. The Sentencing Guidelines contain a compendium of Rules, Comments, and Application Notes addressing a number of elements which figure into the Offense Level calculus. The two elements at issue here are known in Guidelines parlance as "grouping" and "double counting." I will consider them in turn.

### A. Grouping

The grouping of counts resulting in convictions is a function sentencing judges are sometimes required to perform under circumstances specified in U.S.S.G. Chapter Three, Part D, captioned "Multiple Counts."

Part D begins with an lengthy Introductory Commentary, the first paragraph of which reads:

This Part provides rules for determining a single offense level that encompasses all the counts of which the defendant is convicted. The single, "combined" offense level that results from applying these rules is used, after adjustment pursuant to the guidelines in subsequent parts, to determine the sentence. These rules have been designed primarily with the more commonly prosecuted federal offenses in mind.

Harris stresses the following additional statements in the Introductory Commentary:

Some offenses that may be charged in multiple-count indictments are so closely intertwined with other offenses that conviction for them ordinarily would not warrant increasing the guideline range. . . .

Essentially, the rules in this Part can be summarized as follows: ... (2) When offenses are closely interrelated, group them together for purposes of the multicount rules, and use only the offense level for the most serious offense in that group.

The rules which follow this Introductory Comment mandate the grouping of counts for sentencing purposes in certain circumstances. The rules pertinent to this case are found in U.S.S.G. §§ 3D1.1 and 3D1.2, which provide:

### § 3D1.1 *Procedure for Determining Offenses Level on Multiple Counts*

(a) When a defendant has been convicted of more than one count, the court shall:

(1) Group the counts resulting in conviction into distinct Groups of Closely Related Counts ("Groups") by applying the rules specified in § 3D1.2.

(2) Determine the offense level applicable to each Group by applying the rules specified in § 3D1.3.

(3) Determine the combined offense level applicable to all Groups taken together by applying the rules specified in § 3D1.4.

(b) Any count for which the statute mandates imposition of a consecutive sentence is excluded from the operation of §§ D1.2.–3D1.5. Sentences for such counts are governed by the provisions of § 5G1.2(a).

### § 3D1.2 *Groups of Closely Related Counts*

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

§ 3D1.3 contains rules for determining the offense level applicable to each of the groups identified by application of § 3D1.2. § 3D1.4 contains rules for determining the combined offense level, which, as § 3D1.5 provides, becomes the Offense Level prime number the sentencing Court uses when consulting the Sentencing Table.

In *United States v. Szur*, 289 F.3d 200, 214–15 (2d Cir.2002), the Second Circuit summarized the count-grouping protocol:

> Section 3D1.1(a) of the Guidelines establishes a three-step procedure for determining the proper offense level in a case, such as this one, that involves multiple counts of conviction. First, counts that are "closely related" must be grouped in accordance with the provisions of § 3D1.2. Each group is then assigned an offense level, based on the count with the highest offense level within that group. *See* U.S.S.G. § 3D1.3. Finally, if there is more than one group, § 3D1.4 provides that the combined offense level is derived by determining "units" for each group and adding offense level increases for each group to the offense level for the group with the highest specified offense level.

The indictment against Harris contained 24 counts. They are summarized in this Court's pre-trial opinion reported at 805 F.Supp. 166. The counts pertinent to the Sentencing Guidelines grouping issue charged Harris with money laundering in violation of 18 U.S.C. § 1956(a)(2) and wire fraud in violation of § 1343.

Specifically, the indictment alleged in Count Nine that Harris violated the money laundering statute by transferring approximately $7.5 million from the Arochem Companies' account at Chase Manhattan Bank in New York through the Union Trust Company in Connecticut and into Swiss banks owned by Arochem International, Ltd. ("Limited"), knowing that these funds were the proceeds of frauds on financial institutions. By transferring those funds, the government alleged, Harris "concealed from the Chase group of banks the extent to which he was utilizing Limited to finance cargoes in transit and trading activities." 805 F.Supp. at 170.

Counts Ten through Twenty–One alleged that Harris violated the wire fraud statute by arranging a series of transfers of funds of the Arochem Companies in New York to the Swiss bank accounts owned by Limited. Counts Ten through Twenty–One each referred to a single transfer of money, the first occurring on April 12, 1991 and the last on September 19, 1991. The indictment alleged that these transfers were for the purpose of executing Harris's scheme to defraud the lending banks.

The wire fraud counts referred to the same transfers of funds that formed the factual basis of the money laundering count. Because that is so, Harris contends that the money laundering count and the wire fraud counts should have been grouped under U.S.S.G. §§ 3D1.1 and 3D1.2.

Money laundering is invariably related to other criminal conduct. The structure of the money laundering statutes mandate that relationship. The section under which Harris was charged, 18 U.S.C. § 1956(a)(2), is illustrative. It condemns those who transfer funds from a place in the United States to or through a place outside the United States, knowing that the funds being transferred "represent the proceeds of *some form of unlawful activity* . . . " (emphasis added). Frequently, as in the case at bar, the underlying unlawful activity is charged in the same indictment as money laundering; and, in the event of conviction on all counts, it is not surprising that circuit courts of appeals have had

numerous occasions to consider whether the money laundering count should be grouped with the counts charging the related crimes that produced the laundered proceeds.[11]

Harris was sentenced in 1994. At that time other circuits had considered the question, but the Second Circuit had not decided whether, or in what circumstances, a money laundering count should be grouped with other counts of conviction. Since 1994, the Second Circuit has addressed the issue in five cases, which I will cite in the order they were decided: *United States v. Napoli*, 179 F.3d 1 (2d Cir. 1999); *United States v. Kalust*, 249 F.3d 106 (2d Cir.2001); *United States v. Sabbeth*, 262 F.3d 207 (2d Cir.2001); *United States v. McCarthy*, 271 F.3d 387 (2d Cir. 2001); and *United States v. Szur*, 289 F.3d 200 (2d Cir.2002).

In *Napoli*, the defendant concocted a scheme for luring buyers in foreign countries to make deposits in the United States for large quantities of cigarettes that were never delivered, and was convicted on twenty-one counts of money laundering and nine counts of wire fraud. Napoli argued that "the district court should have placed his fraud and money laundering counts into a single group of related counts under both subsections (b) and (d) of § 3D1.2." 179 F.3d at 6. The Second Circuit disagreed. As to § 3D1.2(b), the court observed that the subsection applies only when "counts involve the same victim," and said that "[t]he 'victims' of fraud counts are those persons who have lost money or property as a direct result of the fraud," whereas "[t]he 'victim' of money laundering is, by contrast ordinarily society at large," an analysis which led the Second Circuit to this conclusion: "Because we find that Napoli's fraud and money laundering counts involved different harms to different victims, they cannot be grouped under subsection (b)." *Id.* at 7–8. As to § 3D1.2(d), whose applicability the court said "presents a more difficult question," the court noted the admonition in Application Note 6 to § 3D1.2 that "two counts that measure harm in quantities should only be grouped if the counts are also of the 'same general type.'" After analyzing the nature of the two crimes and their sentencing protocols under the Sentencing Guidelines, the Second Circuit held that "Napoli's fraud and money laundering counts are not of the 'same general type' and should not be grouped together under subsection (d)." *Id.* at 10, 13.

In the course of its textual discussion of § 3D1.2(b), the Second Circuit dropped a footnote, 179 F.3d at 8 n. 3. I will refer to it as the "*Napoli* Footnote." As subsequent decisions show, the *Napoli* Footnote has taken on something of a life of its own. The Footnote begins by saying:

> We need not decide here whether we agree with those circuits that have held that the function of money laundering can sometimes be so highly interwoven into a fraud scheme that the fraud victim is the direct victim of the money laundering counts as well (collecting cases).

That question did not arise because, the *Napoli* Footnote continues,

> Napoli's laundering activities were only integrated into his fraud scheme insofar as he lured individual victims into the fraud by leading them to believe that their deposits were secure in Pincus's escrow account. Napoli also, however, used casinos, gambling and other accounts to disperse the proceeds for personal use. This activity invaded the precise societal interests that Congress had

---

11. The Supreme Court has not yet addressed this issue.

in mind when it passed the Money Laundering Control Act of 1986.

In that regard, the Footnote observed that Congress passed the Money Laundering Control Act of 1986 in order to add punishment for "conduct that follows in time the underlying crime *rather than to afford an alternative means of punishing the prior 'specified unlawful activity.'*"

(citing and quoting *United States v. Johnson*, 971 F.2d 562, 569 (10th Cir.1992)) (emphasis added by the Second Circuit). That language could be read as supporting Harris, since his fund transfers alleged in the wire fraud counts are the same transfers charged as money laundering, *i.e.*, occurring at the same time, rather than "follow[ing]" in time the underlying crime."

In *Kalust*, the defendant purchased airbags stolen from cars and resold them throughout the fifty states, laundering the proceeds of his sales through his auto parts business, and used those funds to promote the ongoing conspiracy. Defendant was convicted on counts of transportation of stolen goods in interstate commerce and counts of money laundering. The district court refused to group these counts under U.S.S.G. § 3D1.2(b). The Second Circuit affirmed on the basis of *Napoli*, whose holding the *Kalust* court reiterated:

> Our holding in *Napoli* was predicated on the requirement in U.S.S.G. § 3D1.2(b) that, for grouping to be appropriate, the counts must "involve the same victim." We concluded that "[t]he 'victims' of fraud counts are those persons who have lost money or property as a direct result of the fraud, while [t]he 'victim' of money laundering is, by contrast, society at large."

249 F.3d at 108–09 (footnote omitted). The Second Circuit's opinion in *Kalust* rejected the defendant's contention that *Na-*

*poli* was distinguishable because *Napoli* involved money laundering for the purpose of "concealment," as prohibited by 18 U.S.C. § 1956(a)(1)(B), whereas in *Kalust* the defendant's conviction related to "promotion" money laundering under § 1956(a)(1)(A)(i). *Id.* at 109 ("[N]one of the circuits has, to date, adopted a regime under which promotion money laundering results in grouping, while concealment money laundering does not. And we see no basis for drawing such a distinction.").

Judge Winter, while concurring in the result in *Kalust*, disagreed on that particular point. In his view, "the caselaw that identifies society as the victim of so-called concealment money-laundering makes sense. Concealment laundering follows a crime and by itself has no identifiable victim.... Because promotion money-laundering, by definition, results in identifiable, additional crimes, it usually produces identifiable victims, and did so here, namely, the successive victims of Percan's airbag thefts." 249 F.3d at 112. Judge Winter would have allowed grouping under § 3D1.2(b). To the extent that the distinction may be urged in the case at bar, I am of course bound by the majority opinion in *Kalust*.

The defendant in *Kalust* also invoked the *Napoli* Footnote, but to no avail. On that score the *Kalust* court said (with what I take to be one voice):

> Percan relies on the footnote in *Napoli* that reserved decision on whether, in some circumstances, money laundering is "so highly interwoven into a fraud scheme that the fraud victim is the direct victim of the money laundering as well." *Napoli*, 179 F.3d at 8 n. 3. Appellant claims that his is just such a case, and, therefore, that grouping is in order.

> We disagree. Percan's money laundering activity and his participation in the

stolen airbag conspiracy can only be viewed as more interwoven than the money laundering and fraud at issue in *Napoli* insofar as this case involves promotion, and *Napoli* concealment, money laundering. And, as we have already said, that distinction does not undermine the reasoning of *Napoli.* That is, it does not, on its own, make the victims of the two crimes the same for grouping purposes.

249 F.3d at 110.

In *Sabbeth,* a group of lending banks were victimized by bankruptcy fraud. The defendant also engaged in money laundering, transferring assets from SIL, the borrower company he controlled, into bank accounts under his or his wife's names, and then transferring them again "into secret accounts that he had set up using his wife's maiden name, his mother-in-law's address, and false social security numbers." 262 F.3d at 211. The district court refused to group the money-laundering and fraud counts. The Second Circuit affirmed. Defendant relied primarily upon the *Napoli* Footnote, where, the *Sabbeth* court said, "we left open the possibility of grouping fraud and money laundering if they are 'so highly interwoven . . . that the victim' of each is the same." *Id.* at 221. The *Sabbeth* court reiterated U.S.S.G. § 3D1.2(b)'s requirement that different counts "involve the same victim" in order to be grouped, and recalled that in *Napoli* "[we] reasoned that fraud and money laundering generally involve different harms to different victims. As we explained, the victims of fraud are those who are defrauded; on the other hand, the victim of money laundering is 'ordinarily society at large.'" The defendant in *Sabbeth* derived no benefit from the *Napoli* Footnote because

> [a]s in most cases involving these two offenses, Sabbeth's fraud and money-laundering conduct involved different

harms to different victims. Sabbeth caused injury to the Banks by fraudulently conveying assets of SIL, and he caused injury to society at large by laundering those assets to deter others from discovering his criminal activity. The District Court therefore properly refused to group these two offenses under Section 3D1.2(b) of the Guidelines for purposes of sentencing.

*Id.*

In *McCarthy,* the defendant embezzled funds from employee benefit plans covered by the ERISA statute, accomplishing the embezzlement by a series of transfers of assets from the plans into a number of bank accounts defendant set up for the purpose. The district court refused to group the embezzlement and money laundering convictions. The Second Circuit affirmed, stating that "[t]his case falls squarely within our holding in *United States v. Napoli,*" which the court then proceeded to quote, and also cited *Sabbeth.* The *McCarthy* court concluded:

> Similarly, McCarthy's crimes here had two sets of victims. The victims of the pension embezzlement are Lloyd's employees who had pension and 401(k) plans. The victim of the money laundering is society at large, hurt by McCarthy's use of the embezzled funds.

271 F.3d at 400–01.

The defendant in *McCarthy* relied upon the *Napoli* Footnote, "urg[ing] us to find his actions have been 'so highly interwoven' as to require grouping." 271 F.3d at 401. The Second Circuit rejected the effort:

> However, like the *Napoli* court, we find we need not reach the issue here. McCarthy's acts of embezzlement and money laundering were not so interlaced that "the fraud victim is the direct victim of the money laundering as well." The cases upon which McCarthy relies

are distinguishable because in those cases defendants, for the most part, used the laundered money to keep their original fraud schemes going (citing cases). McCarthy asks us to adopt the Third Circuit's approach in *United States v. Cusumano,* which permitted the grouping of money laundering and pension embezzlement because "[t]he victim of the offenses in this case was the Fund and its beneficiaries," arguing that here, too, the "victim of all offenses" was the Plans and their beneficiaries. *United States v. Cusumano,* 943 F.2d 305, 313 (3d Cir.1991). The Third Circuit's characterization of the victims in a pension embezzlement and money laundering scheme clearly differs from ours. We respectfully disagree with the Third Circuit's reasoning and agree with our own precedent. *See Napoli,* 179 F.3d at 7–8.

*Id.*

In *Szur,* the defendant stock brokers were convicted of wire fraud in connection with a scheme by which they concealed from stock purchasers their exorbitant commissions and misrepresented that the commissions were small. They were also convicted of money laundering, the government charging that defendants made "transfers of wire fraud proceeds" into bank accounts controlled by certain defendants. 289 F.3d at 213. The district court refused to group the fraud and money laundering counts. The Second Circuit affirmed. Defendant argued that "the wire fraud and money laundering offenses in this case were so tightly interwoven that the victims of the two offenses were the same." *Id.* at 215. The *Szur* court acknowledged that in *Napoli* "we left open the possibility of grouping fraud and money laundering if they are so highly interwoven that the victim of each is the same," *id.* (citation and internal quotation marks omitted), but rejected once again a defen-

dant's effort to find refuge in the *Napoli* Footnote:

> We agree with the district court's conclusion that the victims of the fraud and money laundering offenses in this case were distinct—the individual investors suffered from the appellants' fraud, while the public as a whole was the victim of appellants' efforts to conceal their relationship to one another and the source of their illegally obtained funds.

*Id.* at 216.

This unbroken line of Second Circuit decisions refusing to group money laundering counts with counts of conviction for fraud and other underlying crimes poses an obvious problem for Mr. Lynam, Harris's able counsel, who argues that in this case the money laundering count must be grouped with the wire fraud counts. In his briefs and at oral argument, counsel relied upon cases from other circuits, the *Napoli* Footnote, and a decision by Judge Leisure of this Court in *United States v. Piervinanzi,* No. 89 Cr. 299(S–9), 1992 WL 88207 (S.D.N.Y. April 17, 1992). When during oral argument Mr. Lynam focused upon the state of the law at the time I sentenced Harris, he stressed *Piervinanzi* and the Third Circuit's decision in *Cusumano* as decisions favoring grouping and "available at that time," Tr. 76, and also professed to find support in Judge Winter's concurring opinion in *Kalust.*

■ These authorities do not carry the day for Harris. Decisions of other circuits are not binding upon me, but Second Circuit decisions are; and, while the Second Circuit had not considered this grouping issue when I sentenced Harris, it has done so subsequently, in *Napoli, Kalust, Sabbeth, McCarthy,* and *Szur.* As noted *supra,* in *McCarthy* the Second Circuit specifically disapproved *Cusumano,* rejecting the Third Circuit's "characterization of the vic-

tims in a pension embezzlement and money laundering scheme" as "clearly differ[ing] from ours"; Harris can no longer derive any comfort from *Cusumano*. In *Piervinanzi*, Judge Leisure did indeed group a money laundering offense with a bank fraud offense, reasoning that "the money laundering offense was committed in furtherance of the bank fraud, and the offenses involved essentially the same victim," 1992 WL 88207, at *3; but the sentence was entered following a plea of guilty, the government apparently did not argue against this grouping and did not appeal the sentence, and the line of Second Circuit cases beginning with *Napoli* lay in the future. One doubts that Judge Leisure would group those counts today. As for Judge Winter's concurrence in *Kalust*, Mr. Lynam said it made the point that "the notion of society as the victim only comes into play if there is no identifiable victim," Tr. 69. But this misstates the opinion. Judge Winter's only disagreement with the *Kalust* majority lay in his view that the victims of promotion money-laundering were sufficiently identifiable to preclude characterizing society as the victim; but he also said that "the caselaw that identifies society as the victim of so-called concealment money-laundering makes sense." 249 F.3d at 112. Harris was convicted of violating 18 U.S.C. § 1956(a)(2), which prohibits *inter alia* a transfer of funds "designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," § 1956(a)(2)(B)(ii); and the indictment specifically alleged that by the fund transfers through Connecticut into Swiss bank accounts Harris "concealed from the Chase group of banks the extent to which he was utilizing Limited to finance cargoes in transit and trading activities." *See Harris*, 805 F.Supp. at 170. In short, Harris was charged with and con-

victed of concealment money-laundering; and Judge Winter, together with the rest of the *Kalust* panel, would identify society as the victim.

This Court sentenced Harris, and Mr. Lewis represented him in the court of appeals, before the Second Circuit issued its opinions in *Napoli* and the subsequent grouping cases discussed *supra*. At oral argument the question arose as to the proper consideration to be given Second Circuit decisions not yet written in evaluating the correctness of this Court's sentence and the efficacy of Mr. Lewis's appellate advocacy. It now seems to me that the only sensible course to follow is to assume that if the *Napoli, Kalust, Sabbeth, McCarthy*, and *Szur* cases had come before the Second Circuit prior to my sentencing of Harris, the court of appeals would have decided them the same way. There is no logical basis for believing otherwise.

That being so, it follows that Harris's contention that the money laundering count must be grouped with the fraud counts fails. Whatever encouragement the *Napoli* Footnote held out to defendants in like circumstances is diminished by the Second Circuit's subsequent repeated refusals to group money laundering with the underlying substantive offenses. For the defendants in the cited post-*Napoli* cases, the *Napoli* Footnote has proved to be an elusive, if not illusory, will-o'-the-wisp. I recognize that the *Napoli* court said in the Footnote that it "need not decide here" whether "money laundering can sometimes be so highly interwoven into a fraud scheme" that the victims are the same and grouping is mandated; nor has the Second Circuit said since that this circumstance can never occur. So it may conceptually be possible to argue that the Footnote's candle of hope still flickers. But it flickers amid the encircling gloom of the later deci-

sions. And I am unable to discern any principled difference between those cases and that of Harris. That is particularly true with *McCarthy*, where the defendant accomplished his embezzlements from the employee pension funds by the transfers of funds which also constituted money laundering.

I read the line of Second Circuit cases beginning with *Napoli* and extending through *Szur* as establishing a rule in this circuit that at least where, as in the case at bar, a defendant engages in concealment money-laundering rather than promotion money-laundering, the individual victims of the underlying crime (such as fraud) are different from the victim of the money laundering, which is society. In *McCarthy* the Second Circuit made that rule manifest by its explicit rejection of the Third Circuit's concept of victimhood as expressed in *Cusumano*. When a defendant engages in money laundering to conceal fraudulent conduct, the Second Circuit now seems committed to the view that there are different victims; and it follows that the counts in such a case should not be grouped for Sentencing Guidelines calculations. Therefore I decline to do so in this case. If I am wrong in my understanding of Second Circuit authority, that court must say so.

## B. Double Counting

Harris's second contention is that this Court's imposition of both a two-level severity of offense increase under U.S.S.G. § 2F1.1(b)(2)(A) for "more than minimal planning" and a four-level increase under § 3B1.1(a) for being "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" constituted impermissible double counting.

"Problems of double counting arise normally from the conduct of courts, rather than legislatures." *United States v. Meskini*, 319 F.3d 88, 91 (2d Cir.2003) (a relatively rare case in the latter category, in which the court of appeals rejected a double counting challenge to a statute and Sentencing Guideline directing courts to increase both the offense level and the criminal history category based on a single crime involving terrorism). The Second Circuit went on to say in *Meskini*:

> Impermissible "double counting" is the *judicial* augmentation of a defendant's sentence in contravention of the applicable statute or Sentencing Guideline. As long as the court does not augment a sentence in contravention of the applicable statute or Sentencing Guideline, no forbidden double counting occurs.

*Id.* (emphasis in original, citations and internal quotation marks omitted).

§ 2F of the Sentencing Guidelines deals with offenses involving fraud or deceit. Under U.S.S.G. § 2F1.1(a), the base offense level is 6. Under § 2F1.1(b)(1), the level is increased depending upon the dollar amount of the loss, up to any amount in excess of $80,000,000, which Harris's scheme achieved, resulting in an addition of 18 levels. § 2F1.1(b)(2) provides for a two-level increase "[i]f the offense involved (A) more than minimal planning, or (B) a scheme to defraud more than one victim." In Harris's case, the Pre–Sentence Report recommended a two-level enhancement based upon subsection (A). I accepted that recommendation.

§ 3B of the Sentencing Guidelines deals with the defendant's role in the offense. U.S.S.G. § 3B1.1, captioned "Aggravating Role," provides in subsection (a) for a four-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

In sentencing Harris, I applied the two-level enhancement provided for by § 2F1.1(b)(2)(A) and also the four-level enhancement provided for by § 3B1.1(a). Harris initially contended on the present motion that this constituted impermissible double counting. He argued that the four-level increase under § 3B1.1(a) "was based on the same conduct as the increase for more than minimal planning," since "[a] leader or organizer of five or more participants or otherwise extensive conduct must necessarily engage in conduct that involves more than minimal planning." Main Brief at 23. In other words,

> Even if the four-level increase is deemed to have been imposed for being a leader or organizer of five or more participants, the conduct inherent in being such a leader—as described in the [Pre–Sentence Report]—necessarily involves more than minimal planning. Thus, the two level increase for more than minimal planning constitutes double counting under either prong of § 3B1.1(a).

*Id.*

While this argument appeared to represent an effort to avoid the two-level enhancement for minimal planning under § 2F1.1(b)(2)(A), at oral argument Mr. Lynam expanded his submission. He pointed out that Harris was convicted of conducting a continuing financial crimes enterprise in violation of 18 U.S.C. § 225, which applies to anyone who, *inter alia*, "organizes, manages, or supervises a continuing financial crimes enterprise," defined as "a series of violations" of specified statutes (including wire fraud) "affecting a financial institution, committed by at least 4 persons acting in concert." That circumstance allowed Mr. Lynam to argue that the four-level enhancement under § 2F1.1(b)(2)(A) improperly "double counts the underlying offense," citing *United States v. Rosario*, 7 F.3d 319 (2d Cir.1993), so that the proper

remedy for this Court to fashion "is to eliminate the four-level enhancement for being an organizer or leader, or alternatively, the court should eliminate the two-level increase for more than minimal planning," Tr. 82. Counsel stressed that even the less favorable alternative elimination of two levels for minimal planning would, if combined with a two-level adjustment for grouping, entitle Harris to be released in September of 2003. Tr. 83.

At Harris's sentencing, I applied both the "organizer or leader" and "more than minimal planning" enhancements on the authority of *United States v. Rappaport*, 999 F.2d 57 (2d Cir.1993). In *Rappaport* the defendant, an accountant, "masterminded a scheme which enabled him to obtain tax refunds from the IRS by filing false individual tax returns," enlisting for this purpose a number of "cohorts." *Id.* at 59. The district court's sentence included a four-level increase for defendant's leadership role in a criminal activity involving five or more participants, pursuant to U.S.S.G. § 3B1.1(a), and a two-level increase for more than minimal planning under § 2F1.1(b)(2)(A). The Second Circuit held that this did not constitute impermissible double counting, which it regarded as "legitimate where a single act is relevant to two dimensions of the Guidelines analysis." *Id.* at 60 (citation and internal quotation marks omitted). The court reasoned:

> [T]he fact that Rappaport had a leadership role in the scheme involving more than five people did not necessarily require him to engage in more than minimal planning. Because leading and planning are disparate aspects of criminal conduct, we reject Rappaport's double counting argument.

*Id.* at 61.

I think it clear enough that at the time I sentenced Harris, *Rappaport* furnished

sufficient authority for my application of both enhancements. However, the Second Circuit has addressed this issue in subsequent decisions; and, using the same approach I adopted in considering the more recent grouping cases, I will also look to certain of the Second Circuit's latest double counting cases.

The first of these is *United States v. Greenfield,* 44 F.3d 1141 (2d Cir.1995). Defendant Greenfield and his co-defendants, Pace and Lyons, joined in a scheme to obtain and make fraudulent use of American Express credit cards, bank accounts, and personal identification numbers. The district court imposed a two-level increase under USSG § 2F1.1(b)(2) "because the offense involved more than minimal planning and resulted in losses to numerous victims," *id.* at 1144, and a two-level increase under § 3B1.1(c) "since Greenfield was an 'organizer' of criminal activity involving less than five participants," *id.* Defendant contended that this amounted to impermissible double counting. The Second Circuit remanded the case to the district court for additional findings concerning Greenfield's "organizing" the participation of Lyons. During the course of its opinion, the court said:

> [A]n increase under § 3B1.1(c) could not be based solely upon Greenfield's extensive planning and preparations in connection with the schemes. To do so would involve impermissible "double counting" in light of the fact that Greenfield had already been assessed an enhancement under § 2F1.1(b)(2), which applies to criminal conduct involving more than minimal planning.

*Id.* at 1146.

To which the attentive reader might inquire: how does that reasoning square with *Rappaport?* At that point in the *Greenfield* text, the court of appeals dropped footnote 3, which I will quote in full:

> The application of enhancements both for a defendant's leadership role under § 3B1.1 and for more than minimal planning under § 2F1.1(b)(2) does not necessarily amount to impermissible double-counting. *See United States v. Rappaport,* 999 F.2d 57, 60–61 (2d Cir. 1993) (noting that "leading and planning are disparate aspects of criminal conduct" and thus these provisions do "not necessarily reflect the same facet of [the defendant's] conduct"). Nevertheless, a sentencing court cannot, in addition to an increase for "more than minimal planning," apply a role-in-the-offense enhancement premised *solely* upon the extensiveness of the defendant's preparation and planning. By doing so, the sentencing court would be impermissibly relying upon the same facet of the defendant's conduct to justify two enhancements. *See id.*

The Second Circuit composed another lengthy footnote in *United States v. Carrozzella,* 105 F.3d 796 (2d Cir.1997). Defendant, an attorney, was convicted of conspiracy and mail fraud charges which included violating his trust as a trustee for the victims in probate court. The district court imposed a two-level enhancement under U.S.S.G. § 2F1.1(b)(3)(B) on the basis that defendant's conduct constituted an "abuse" and "violation" of the Connecticut probate "process," as well as a two-level enhancement under § 3B1.3 for abuse of a position of trust. The Second Circuit held that the first enhancement should not have been made because that subsection of the Sentencing Guidelines applied only to conduct "not addressed elsewhere in these guidelines," and the defendant's conduct was specifically addressed in § 3B1.3. That holding does not bear upon the issues in the case at bar; but the Second Circuit dealt with

double counting in more general terms at 105 F.3d at 801 n. 1. The court there identified a "parallel analysis used to detect impermissible double counting." The first of the two analytical strands establishes that "the prohibition on double counting is not violated where a single act is relevant to two dimensions of the Guidelines analysis," so that "separate enhancements are not duplicative when they reflect different facets of the defendant's conduct." For these propositions, the *Carrozzella* court cited and quoted *Rappaport*. But the footnote continues:

However, double-counting analysis is not solely a determination of whether different Guidelines sections embody overlapping but different elements. *How* a defendant falls under a particular guideline is also relevant to double-counting analysis.

(emphasis in original). That concept, the footnote says, explains the holding in *United States v. Hudson*, 972 F.2d 504, 507 (2d Cir.1992), that

if an object—in that case a car—would constitute a dangerous weapon only when put to a particular use, it would be impermissible double counting to impose an increase for using a dangerous weapon in addition to an increase for aggravated assault.

And it also explains the decision in *Greenfield*. The *Carrozzella* footnote continues:

Similarly, in *United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir.1995), we rejected double enhancements for a defendant's leadership role and for more than minimal planning where the leadership-role enhancement would have to be based solely on extensive planning in connection with the criminal scheme.

In the present case, abuse of the probate process and abuse of public trust are arguably different facets of Carrozzella's conduct but, if *how* a defendant's

conduct is covered by Guidelines § 2F1.1(b)(3)(B) is relevant, then an abuse of the probate process is very similar to abuse of trust. Although one can abuse the probate process without abusing a position of trust and, conversely, abuse a position of trust without abusing a probate process, one cannot abuse the probate process in the way Carrozzella did without abusing a position of trust.

(emphasis in original). This last paragraph may reasonably be read as a caution against double counting.

While this *Carrozzella* footnote cites and adheres to the holding in *Rappaport*, it does seem to me that its paraphrase of *Greenfield* and its seeming warning against double counting even "arguably different facets" of a defendant's conduct may furnish some support for Harris.

It is with some trepidation that I take note of *United States v. Morgan*, 113 F.3d 1230, 1997 WL 268712 (2d Cir. May 21, 1997), an unpublished opinion Mr. Lynam called to my attention at oral argument. Unpublished opinions are not supposed to be cited or relied upon; but an individual's liberty is at stake, and I cannot refrain from observing that in *Morgan*, where the defendant was convicted on six counts of bank fraud and misapplication of bank funds, the Second Circuit rejected the *government's* argument "that the district court erred in refusing to enhance Morgan's sentence for 'more than minimal planning' under U.S.S.G. § 2F1.1(b)(2) on the basis that it would constitute impermissible double counting in light of Morgan's enhancement under § 3B1.1 for his role as leader/organizer of the offense." 113 F.3d 1230, 1997 WL 268712, at *9. The *Morgan* court continued:

In *United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir.1995), we explained that granting an enhancement under

both § 3B1.1 (for role in the offense) and § 2F1.1(b)(2) (for more than minimal planning) would constitute impermissible double counting if both enhancements were based on the same conduct. The district court concluded that the same conduct would be the basis for both enhancements, and refused to impose the second. That assessment was reasonably within the sentencing court's power.

*Id.*

In *United States v. O'Neil*, 118 F.3d 65 (2d Cir.1997), defendant Saia was charged with twelve other individuals in a conspiracy to commit wire fraud through the operation of four telemarketing operations. Following his conviction, the district court's calculation of Saia's offense level included "a 2–level adjustment alternatively based on more than minimal planning or more than one victim" and "a 4–level adjustment for leadership role in the offense," *id.* at 70. The Second Circuit briskly rejected Saia's double counting contention: "This argument is meritless, because the district court relied on factors beyond Saia's role in the offense in applying the planning adjustment and therefore did not engage in impermissible double counting." *Id.* at 76. The particular factors upon which the district court relied are not revealed by the opinion.

Lastly, I will consider *Rosario*, upon which Harris also relies. Defendant assaulted a mail carrier with intent to rob mail matter, during which he immobilized the carrier by stepping on his throat. At sentencing the district court calculated a base offense level of twenty and added two levels each for stealing property of the Postal Service, bodily injury to the victim, and physical restraint in the commission of the offense. On appeal defendant challenged the two level enhancement for "physical restraint" in connection with the

robbery charge. The Second Circuit rejected that contention, but Harris finds support for his position in the court's reasoning:

> Application of the enhancement for physical restraint is proper *as long as restraint is not an element of the primary offense for which the defendant is being sentenced,* and it therefore does not result in double counting offense conduct toward sentencing.

7 F.3d at 321 (emphasis added). The *Rosario* court said that defendant's argument "ignores the difference between the use of force in committing a robbery, and forcible restraint of a victim's mobility in order to facilitate the crime"; the enhancing guideline required "that the forcible restrain facilitate, as opposed to constitute, the commission of the offense," and "[f]acilitation of the offense is the 'added something' which justifies imposition of the physical restraint enhancement." *Id.* (citation omitted).

What is the effect of these more recent Second Circuit cases upon the propriety of double counting in Harris's sentence? I think that if the only basis for imposing upon Harris a two-level enhancement under § 2F1.1(b)(2) was the "more than minimal planning" provision in subsection (A), it would be problematical to couple that enhancement with an additional four-level enhancement for being "an organizer or leader" under § 3B1.1(a). I recognize that *Rappaport* allowed double counting in those circumstances, and the Second Circuit has never repudiated *Rappaport*. Nonetheless, the holdings, rationales, or footnoted reflections in *Greenfield, Carrozzella,* and *Morgan* suggest that if Harris were sentenced today, and "more than minimal planning" was the only ground justified by the trial evidence for imposition of a § 2F1.1(b)(2) enhancement, combining that enhancement with one under

§ 3B1.1(a) would constitute impermissible double counting. After all, in *Carrozzella* the Second Circuit characterized its holding in *Greenfield* as "reject[ing] double enhancements for a defendant's leadership role and for more than minimal planning where the leadership-role enhancement would have to be based solely on extensive planning in connection with the criminal scheme." 105 F.3d at 801 n. 1. That would seem to describe Harris's situation.

■ But I need not pursue that question further because the second, unrelated, and alternative basis for a § 2F1.1(b)(2) enhancement also applies to Harris. The trial evidence showed that the scheme devised by Harris while at Arochem defrauded a consortium of lending banks. Each bank lost money; each bank was a victim. § 2F1.1(b)(2)(B), preceded by the disjunctive "or," provides for a two-level enhancement "if the offense involved a scheme to defraud more than one victim," a provision clearly applicable to Harris. That reality entirely eliminates the overlapping effect Harris stresses between the more than minimal planning and leadership-role enhancements. At oral argument, AUSA Failla professed to find in my remarks at sentencing a reliance upon subsection (B). I am not at all sure she is right; content, like beauty, sometimes lies in the eye of the beholder. But it is of no moment. Harris's motion tests the legality of the sentence passed upon him, and I may adhere to that sentence for any reason supported by the record, whether or not I relied upon it at the time of sentencing. This theory of impermissible double counting fails.

That leaves Harris's argument, based on *Rosario*, that his conviction under 18 U.S.C. § 225 as the organizer of a scheme "affecting a financial institution, committed by at least 4 persons acting in concert" precludes a four-level "organizer or leader" role enhancement under U.S.S.G. § 3B1.1(a) because the group organizer Guidelines element is also "an element of the primary offense for which the defendant is being sentenced." *Rosario,* 7 F.3d at 321. This argument might have substance if Harris's only crime of conviction was for violating 18 U.S.C. § 225. The government could have drawn the indictment in that fashion, proving wire fraud under § 1343 and bank fraud under § 1344 as the factual predicates for the § 225 offense, with its 10–year mandatory minimum sentence, *see* § 225(a)(2). But the government chose instead to charge the wire and bank frauds as separate counts in the indictment, and Harris was convicted on them as well. For the reasons stated *supra,* if the government had not included a count under § 225, Harris's sentence could not have been challenged for impermissible double counting. No reason appears why the inclusion of a § 225 charge should change that result. The Second Circuit held in *Meskini,* 319 F.3d at 91, that "[a]s long as the court does not augment a sentence in contravention of the applicable statute or Sentencing Guideline, no forbidden double counting occurs." In this case, for purposes of double counting analysis the applicable statutes are the wire fraud statute, 18 U.S.C. § 1343, bank fraud statute, 18 U.S.C. § 1344, and continuing financial crimes enterprise (or "kingpin") statute, 18 U.S.C. § 225. The applicable Sentencing Guidelines have been quoted *supra.* I am unable to conclude that the sentence passed upon Harris contravened either these statutes or the Guidelines.

Accordingly, I would hold that if, contrary to the conclusion reached in Part I, Harris's motion was not procedurally

barred, the motion is without merit.[12]

## III. CONCLUSION

For the foregoing reasons, Harris's motion is denied in its entirety.

It is SO ORDERED.

**12.** It follows from the conclusions reached in text that Mr. Lewis's assistance to Harris on direct appeal cannot be regarded as constitutionally defective. The test for ineffective assistance of trial counsel declared in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is also "used with respect to appellate counsel." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994). The *Strickland* test requires a habeas petitioner to show, first, "that his attorney's performance fell below an objective standard of reasonableness, and second, he must show that but for counsel's error, the outcome would have been different." *Id.* (citation and internal quotation marks omitted). At the appellate level, a habeas petitioner "may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," *id.*, a showing that Mr. Lynam argues is made by Mr. Lewis's failure to raise these sentencing issues on direct appeal while pursuing others. Given my resolution in this opinion of the sentencing issues against Harris, and notwithstanding my remarks in a prior opinion, I am not able to regard as constitutionally inadequate Mr. Lewis's concentrating on other issues on the appeal; and, in any event, my conclusions on the sentencing issues preclude me from finding that, but for Mr. Lewis's failure to raise them on direct appeal, the outcome in the Second Circuit would have been different. This is an added basis for holding that Harris's present motion is procedurally barred, since as stated in Part I the allegedly inadequate assistance Mr. Lewis gave to Harris on appeal was a necessary link in the chain Mr. Lynam attempted to forge to avoid that bar.